The COUNCIL OF the DORSET CONDOMINIUM APARTMENTS, an unincorporated condominium council organized and existing pursuant to 25 Del.C. § 2201, et seq., Plaintiff,

v.

Edward O. GORDON, Peggy S. Pranzo and Drucilla D. Wetzel, Trustee U/A/D October 27, 1998, Defendants.

C.A. No. 18476.

Court of Chancery of Delaware, New Castle County.

Submitted: Feb. 8, 2001.
Decided: April 10, 2001.

Daniel R. Losco, Losco & Marconi, P.A., Wilmington, for Plaintiffs.

Benjamin C. Wetzel, III, Bailey & Wetzel, P.A., Wilmington, for Defendants.

## OPINION

LAMB, Vice Chancellor.

This is an action by the governing body of a condominium association against three of its unit owners for a declaration that

they are obliged to pay their share of a special assessment. The complaint also seeks permanent injunctive relief allowing plaintiff and its agents access to the units owned by the defendants to permit the completion of work covered by the assessment.

I conclude that the defendants are liable to pay a portion of the special assessment relating to work that was properly authorized by the governing body of the association. I also conclude, however, that a major portion of the assessment was for work that was not properly authorized either by the governing body or by vote of the unit holders of the association. Thus, the relief granted will be limited to an order requiring defendants to pay the valid portion of the assessment.

## I.

The Council of the Dorset Condominium Apartments ("Council"), plaintiff, is an unincorporated condominium council organized and established pursuant to 25 Del. C. § 2201 ("the Act") to manage the business operation and affairs of The Dorset Condominium Apartments (the "Dorset") located at 1301 N. Harrison Street, Wilmington, Delaware. The Dorset is a mixed use condominium, established under the Act by virtue of an Enabling Declaration dated December 22, 1983 (the "Declaration"). The Council is elected at an annual meeting of the association of unit owners ("Association") and is charged with the management and operation of the Dorset. The Council is empowered to prosecute actions for the enforcement of the Declaration and the related Code of Regulations for the Dorset (the "COR").

The Council brings this action against Edward O. Gordon, Peggy S. Pranzo and Drucilla D. Wetzel, as Trustee U/A/D October 27, 1998. Defendant Gordon is the owner of Units 507 and 1402 at the Dorset. Defendant Pranzo is the owner of Unit 502. Defendant Wetzel is trustee of a trust that is the owner of Unit 901. Pursuant to Article 1 of the COR and Article 11 of the Declaration, the defendants are subject to the terms, conditions and provisions of the Declaration and the COR, including those relating to the imposition and collection of assessments.

### A. Spring 2000 Special Assessment

Two aspects of the assessment at issue are in contention. First, the Council authorized the expenditure of $200,000 to replace a concrete parking deck without first submitting the matter to a vote of the unit owners. Second, the Council solicited a vote of unit owners to approve the expenditure of not more than $600,000 to pay for the installation of all new windows and sliding glass doors in the building and then assessed the cost of doing so as a "Common Expense." [1]

#### 1. Concrete parking deck

On January 26, 2000, at the annual meeting of the Association, The Breckstone Group, Inc. presented a proposal to replace the rear parking deck, which was said to have reached the end of its useful life. Its report appears in the minutes of the meeting. Thereafter, the Council contracted to have the parking deck replaced and related work performed on the parking garage, for a total of $200,000. The Council did not submit the issue of the parking deck contract to a vote of the Association. The new decking is more or less the same as the old, although it has

---

1. The total special assessment for Unit 507 is $6,134 exclusive of interest. The total special assessment for Unit 1402 is $11,551 exclusive of interest. The total special assessment for Unit 502 is $8,954 exclusive of interest. The total special assessment for Unit 507 is $9,486 exclusive of interest.

somewhat superior water proofing qualities due to advances in technology.

### 2. Window replacement

In November 1998, the Council recommended that the installation of new windows and sliding glass doors throughout the building and called for a special meeting of the Association to vote on that issue. The Council estimated the cost of the project at $520,000 and stated that it would also save $30,000 on other work needed to caulk and re-set the existing frames. Fewer than a majority of the ballots were returned, and the proposal failed.

In February 2000, the Council again proposed replacing all of the windows and sliders in the building and called another special meeting for that purpose. In soliciting votes in favor of this project (estimated to cost no more than $600,000), the Council reported that the project would avert the need "to spend between $160,000 and $200,000 on caulking and sill realignment to halt water penetration around our present obsolete windows." The ballot results, as of April 1, 2000, reported that unit owners representing 52.3 percent of the aggregate proportionate interest in the Dorset had voted in favor of the proposal.

In response to the passage of this proposal, defendants solicited signatures on a petition calling for a special meeting of the Association "for the purpose of debate, review and vote on the issue of window replacement; and to institute a super majority vote requirement on special assessments." The petition was signed by the requisite percentage of unit owners and was considered by the Council at its regular meeting on May 15, 2000. Although the Council did not support either of the initiatives in the petition, it gave notice of a special meeting of the Association to be held on May 31, 2000.

The first two paragraphs of the notice sent by the Council report that a meeting was being called in response to the petition and state the time, place and purpose of the meeting. Thereafter, the notice reports the Council's opposition to the proposed agenda items and states that "*Council also feels obligated to advise you that, even if a quorum is achieved and even if a majority of attendees vote in favor of petitioner's proposals, neither of the proposals will be effective.*" (Emphasis in original.) The notice continued, as follows: "The window replacement project has been approved, its cost assessed, and the work is being bid." The notice also reported the Council's view that the proposal to impose a supermajority vote requirement for special assessments was inconsistent with the Unit Property Act and stated that "Council must reject any initiative to institute petitioners' unworkable and counter-statutory scheme at the Dorset." [2]

The special meeting was convened on May 31, 2000 but was adjourned until June 14, 2000, for lack of a quorum. The Council met immediately thereafter and entered into a contract for the replacement of all windows and sliders at the Dorset for a total price of $579,250.[3] Defendants thereafter refused to admit workmen into their respective units and refused to pay any part of the special assessment. As a consequence, the original windows and sliders remain in their units, creating a lack of

---

**2.** Defendants testified that their request for a list of names and addresses of non-resident unit owners was not properly honored by the company managing the Dorset, a failure that they attribute to Council. They received only a list of names and were unsuccessful in locating addresses for a majority of those persons.

**3.** When the meeting was reconvened on June 14, 2000, it again failed to attract a quorum and, so, no business was conducted.

uniformity in the exterior appearance of the building that is visible upon close inspection.[4]

## B. The Reserve

The total amount of the special assessment in the spring of 2000 was $940,000. This amount reflects a total of $1,005,000 in work authorized, minus a transfer of $65,000 from the Dorset's reserve accounts.[5] The amount of reserves available to be applied against this work was a matter of some confusion to defendants and, no doubt, other residents of the Dorset. They believed, for example, that there was a reserve of $200,000 available to pay for the work on the concrete parking deck. At trial, William Ryan, Jr., who was Treasurer of the Association at the relevant time, testified about the Dorset's reserve accounting. He explained that, while the Dorset reported a reserve for major replacements of $651,150 as of December 31, 1999, it was also reported to residents that there was only $215,000 in cash available to fund such reserve. The difference is the amount by which the Dorset was underreserved as of the end of 1999.[6] Of the $215,150 cash reserve amount, only $65,000 was properly applied against the work to be performed in 2000.

4. An amount was credited against the contract price to reflect the cost of the labor and materials for the units owned by defendants. Thus, the record reflects that the unit owners have only paid for the work that was actually performed.

5. In addition to the work already described, Council also contracted for $225,000 in additional repairs to the exterior of the building.

6. The reported reserve account merely reflects an estimation of the replacement cost and remaining useful life of various major common elements at the Dorset. It is meant to show how much the Dorset should have to be fully reserved for anticipated major re-

## II.

■ The Declaration states that its provisions "shall be liberally construed in order to effectuate Declarant's desire to create a uniform plan for development and operation of a condominium project under the Act."[7] A similar provision appears in the COR.[8] Moreover, where the language of a provision in a condominium's enabling declaration or code of regulations is clear and unambiguous, this court will afford that language its ordinary meaning.[9]

## A. The Parking Deck

■ The issues raised in relation to the parking deck are straightforward. The parking deck is, concededly, a Common Element, and its "maintenance, repair [and] replacement" is specified as a duty of the Council in Article 12.F of the Declaration. Moreover, costs associated with maintaining, repairing or replacing Common Elements such as the parking deck are clearly defined as Common Expenses in Article 12.H of the Declaration, which provides for their assessment as follows:

> The expenses which have been incurred or shall be incurred for the maintenance, repair, replacement, management, operation and use of the Common Elements shall be ... assessed as Common Expenses by the Council.[10]

placements. It does not reflect the actual financial resources of the Dorset.

7. Declaration, Article 30 A.

8. COR, Article 10 E.

9. *Linden Knoll Condominium Ass'n v. McDermott*, Del.Super., 1994 WL 555361, Del Pesco, J., (Aug. 19, 1994).

10. Also, Section 2211(2) of the Act prescribes the duties of Council to include:

> The assessment and collection of funds from unit owners for *common expenses* and the payment of such common expenses.

This is all consistent with the Act, which defines a "Common Expense" to include "[e]xpenses of administration, maintenance, repair and replacement of the common elements."[11]   Moreover, unless the Council's approval of the parking deck replacement project was, for some other reason, unauthorized, defendants are obligated to pay their proportionate share. Section 2233 of Title 25 provides that:

> All sums assessed by resolutions duly adopted by the council against any unit for the share of *common expenses* chargeable to that unit shall constitute the personal liability of the owner of the unit so assessed . . . .

I also note that the Council is empowered by Section 2234 of Title 25 to sue to enforce such liability.

■   The defense to the claim relating to the parking deck is twofold: first, the defendants argue that the assessment was invalid because the Council failed to submit the proposed expenditure to a vote of unit owners in accordance with Article 12.I of the Declaration; and second, they argue that the cost of the work should have been paid for out of the Dorset's reserve accounts.   Neither of these arguments has merit.

Article 12.I is a mechanism for defining as Common Expenses certain costs of adding to, altering or improving the Common Elements.   It provides as follows:

> [W]henever in the judgment of the Council the Common Elements shall require additions, alterations or improvements costing in excess of Forty Thousand Dollars ($40,000) during any period of twelve (12) consecutive months, and the making of such additions, alterations or improvements shall have been ap-

proved by a majority of the Unit Owners, the Council shall proceed with such additions, alterations or improvements and shall assess all Unit Owners for the cost thereof as a Common Expense.

There is no statutory analog of this provision, but it is plainly authorized by 25 *Del C.* § 2202(4)(c), that contemplates that expenses may be "declared common" by provisions of the Declaration.

Defendants' argument that this provision applied to the replacement of the concrete parking deck misconstrues the fundamental difference between expenditures for "maintenance, repair or replacement" of the Common Elements and those for "additions, alterations or improvements" to them.   Only the latter fall within the scope of Article 12.I's vote requirement.   And there is little doubt that the work the Council authorized on the parking deck was for the replacement of that Common Element, and not for any "addition, alteration or improvement" to it.   The fact that the new decking may have superior waterproofing elements than the 40–year old one it replaced does not transform this replacement into an "improvement."   The record clearly supports the conclusion that the old decking had reached the end of its useful life and was replaced.   Nothing suggests that the superior water-proofing quality of the new decking was either the reason the project was undertaken or materially contributed to an increase in the cost of the replacement project.

Unlike defendants, I read both the statute and the Declaration to contemplate that the Council has a positive duty to see to the necessary repair, maintenance and replacement of the Common Elements, without any fixed limit on the amount of the annual expense needed therefor and without the need to secure prior approval of the unit owners.[12]   The Council is also

---

**11.**   25 *Del. C.* § 2202(4)(a).

**12.**   A practical restraint on Council's ability to make or increase assessments derives from

the fact that it is a representative body, subject to annual election and to removal by a vote of a majority in interest of the unit own-

charged with the job of establishing and maintaining adequate reserves to meet the anticipated costs or maintaining, repairing and replacing major Common Elements and, thus, to avoid the need for special assessments. Of course, the establishment of an adequate reserve account presumably requires higher regular assessments than many associations choose to bear.

## B. The Windows and Sliders

■ The assessment for the installation of all new windows and sliding glass doors raises more difficult issues.

The central inquiry is whether the assessed cost of that project was a "Common Expense." The term "Common Expense" is defined in the Act, to mean and include, the following:

a. Expenses of administration, maintenance, repair and replacement of the common elements;

b. Expenses agreed upon as common by all the unit owners, and

c. Expenses declared common by provisions of this chapter or by the declaration or the code of regulations.

25 *Del. C.* § 2202(4). For the cost of the project to qualify as a "Common Expense" under subpart (a), the windows and sliders would have to be "Common Elements." To qualify under subpart (c), that cost would otherwise have to have been declared "common" by law or by some provision of the Declaration or COR. Subpart (b) of § 2202(4) would seem to require unanimous agreement among unit owners and, thus, is irrelevant.

ers at any time, and without cause. COR, Article 3.F.

**13.** *Council of Unit Owners of Sea Colony East, Phase III Condominium v. Carl M. Freeman*

### 1. The windows and sliders are not Common Elements

At the Dorset, windows and sliding glass doors are not common elements but are defined as part of the condominium unit itself. The Declaration defines "common elements" to mean "all the parts of the Property other than the Units ...." A unit is defined to include the following:

(2) The front entrance door and any other entrance door of a Unit, the patio or balcony connected to a Unit (including *all doors leading to such patio or balcony*), *all windows of a Unit,* all interior partition walls, floors and other partitions located within a Unit (*including the space occupied by such* walls, floors, partitions and *frames of any windows, doors* or other openings in such walls, or partitions), excepting such part of the interior walls, floors and partitions located within a Unit which may be load bearing and comprise part of the Common Elements.

(Emphasis added). Thus, because windows and sliders are not Common Elements, the cost of replacing them cannot be defined as a "Common Expense" under subsection 2202(4)(a).[13]

### 2. The assessment was not for a Common Expense

■ I turn, then, to the question whether the cost of installing all new windows and sliders was "declared common" by provisions of the Act or the Dorset's internal organizational documents.

Article 13 of the Declaration governs the maintenance and repair of units and divides the responsibility therefor between the Council and the unit owners. Article

*Assoc., Inc.,* Del.Super., C.A. No. 86C–AU–52, 1989 WL 5149, Martin, J. (Jan. 17, 1989) (windows and balcony doors not common elements).

13.B(2) prescribes that the Council shall have the responsibility "to repair, maintain or replace" "[a]ll portions of a Unit which constitute a part of the exterior of the Building including any balcony or patio." The windows and sliders are "portions of a Unit" and they constitute "a part of the exterior of the Building." Thus, the Council argues that it has a duty to repair, maintain and replace them.

This interpretation is made untenable by the Declaration's express provision, in Article 13.C(5), that it is the responsibility of the unit owner to "maintain, repair and replace all ... windows and doors in such Unit." Defendants also argue that I should construe Article 13.B(2) narrowly to exclude windows and sliders, pointing to the omission from it of any reference to windows and sliders and the inclusion of the express reference to "any balcony or patio." This construction is strengthened by reference to the express provision in Article 13.A that all "repairs and maintenance of the balcony or patio included within the Unit shall be the responsibility of the Council and performed at the Council's expense." As already noted, the analog reference to windows and sliding glass doors puts the onus of maintenance, repair and replacement on the unit owners.

Reading all of the provisions of Article 13 together leads to the conclusion that the unit owners at the Dorset bear the primary obligation to maintain, repair and replace the windows and doors in their units. Council's duty to maintain and repair the exterior of the building cannot be interpreted so broadly as to nullify the responsibility of a unit owner with respect to windows and sliding glass doors. I note that this interpretation is consistent with the provisions of Article 13.A, requiring a unit owner to obtain written permission from the Council before doing any work on the exterior of the unit or the building. Thus, while a unit owner is responsible for the replacement of the windows or sliding glass doors in his unit, his ability to do so is subject to the authority of the Council to control the Common Elements and the duty of Council with respect to the exterior surfaces of the building.

Given this reading of Article 13, the conclusion follows that there is nothing in the law, the Declaration or the COR declaring the cost of replacing the windows and sliders to be a Common Expense of the association, within the meaning of 25 *Del. C.* § 2202(4). Thus, Council had no power to assess the cost of that replacement project to the defendants.

*3. Other justification for the assessment*

■ In reaching this conclusion, I have also considered and rejected the suggestion that the Council's duty to "maintain, repair and replace" the exterior elements of the building is a sufficient source of authority to justify treating the cost of replacing the windows and sliders as a Common Expense. Article 5.A(2) of the COR of the Association providing, as follows:

> Each year ... the Council shall adopt a budget for the Property containing an estimate of the total amount which it considers *necessary* to pay the cost of maintenance, management, operation, repair and replacement of the Common Elements *and those parts of the Units as to which it is the responsibility of the Council to maintain, repair or replace* ... and other expenses that may be declared to be Common Expenses by the Unit Property Act, the Declaration, this Code of Regulations or a resolution of the Association of Owners ....

(Emphasis added). Even if I read Article 13.B(2) broadly to impose on the Council some concurrent duty to replace windows and sliders, the record would not support the conclusion that the work done was, in

fact, "necessary" to the performance of that duty.

To begin with, I must construe any such duty to "replace" the windows and sliders in the context of a Declaration and COR that clearly distinguish between "necessary" expenditures for "maintenance, repair and replacement," on the one hand, and expenditures incurred for "additions, alterations or improvements," on the other. If the window and sliding glass door project is properly understood to be an "addition, alteration or improvement," and not a necessary replacement, I conclude that Article 13.B(2) could not have authorized the Council's action in approving the project, even under an expansive reading of that provision. Moreover, in that case, the vote of unit owners obtained pursuant to Article 12.I would have been insufficient to convert the cost of that project into a "Common Expense" because that provision relates exclusively to changes proposed in the Common Elements, and neither the windows nor the sliders are Common Elements.[14]

In fact, the record suggests that the major impetus to pursue the project was to improve or upgrade the windows and sliding glass doors. The notice sent to unit owners by the Council soliciting their votes lists "Ten Reasons for Replacement," nine of which relate to the superior appearance and performance characteristics of the new windows. Only one item on the list relates

the project to the condition of repair of the existing windows, stating as follows: "the original windows have numerous cracked, chipped or burned panes and some no longer open and close smoothly." This provides little or no evidence that the Council reasonably believed that it was necessary to replace them as part of its duty to maintain and repair the exterior of the building. The notice otherwise describes the superiority of the new windows in terms of noise and thermal insulation, ease of cleaning, tinting to protect room interiors from fading, and the availability of screens. Unit owners were also told that "[b]etter appearing and performing windows will increase unit values, unit rentability and unit sales appeal."

I also note that the Council believed the project to be governed by Article 12.I's requirement for the approval by a majority in interest of the unit owners and proposed such a vote in both 1998 and 2000. The Council's decision to solicit such a vote presumably reflects its view that the proposal involved an alteration or improvement in the building. The Council explained its rationale as follows:

> Because the window replacement will constitute an upgrade costing in excess of $40,000 in one year, the consent of unit owners holding a majority of the pro-rata interests is required for the replacement to proceed.

14. Council argues, in passing, that Article 1.D(1) of the Declaration "provides that the unit owners, by majority vote, may designate certain expenses as Common Expenses, which would then be paid by all the unit owners based upon their proportionate interest." Although the argument is not pressed, it requires some discussion because it overstates the import of the provision cited. Article 1.D(1) is simply the corollary of 25 *Del. C.* § 2202(4)(c), discussed above at p. 729. It defines as Common Expenses "[a]ll expenses agreed upon as Common Expenses by the Unit Owners pursuant to the Declaration and

Code of Regulation." This and the corollary statutory provision provide the necessary authority for Article 12.I, for example. A vote in accordance with that provision declaring certain expenses to be Common Expenses is one taken "pursuant to" the Declaration and, therefore, authorized. Neither provision, however, authorizes the sort of *ad hoc* voting authority Council's argument implies. Moreover, any such vote would not be taken "pursuant to" the Declaration and COR, since Article 12.I is the only provision of its kind found in the governing documents of the condominium.

Although I conclude that Article 12.I is inapplicable since windows and sliders are not Common Elements, the Council's characterization of the proposed project as involving an "upgrade" provides additional reason to conclude that the project did not fall within the Council's duty to "maintain, repair and replace" the exterior elements of the building.

Rather, the evidence, taken as a whole, clearly and unmistakably leads me to conclude that the installation of all new windows and sliders in the building was undertaken as an improvement to the building. It cannot be justified as a valid exercise of the Council's limited duty to maintain the exterior aspects of the windows and sliders and to charge the cost thereof as a Common Expense. Nor is there any provision in the Act or the governing instruments authorizing a majority of the unit owners, by vote, to declare as a Common Expense the cost of *improving* elements of the units, as opposed to the Common Elements.

### 4. Burden of proof

In reaching this conclusion, I find it unnecessary to determine where the burden of proof lies on the issue of the validity of the Council's action in adopting the assessment. Whether the burden is on the Council to prove the validity of its action or on defendants to disprove it, the record is clear that the assessment for the windows and sliding glass doors cannot be enforced against these defendants.[15]

### III.

For all the foregoing reasons, I will enter judgment in favor of the Plaintiff as to that part of the special assessment that did not relate to the work performed on the windows and sliding glass doors, with interest on the amount due at the legal rate. The request for a mandatory injunction allowing workmen access to the defendants' units is denied, as is the request for additional costs and expenses.

The parties' counsel are directed to confer and to submit a form of order to the Court within 10 days of the date hereof.

---

15. I also find it unnecessary to discuss or consider the defendants' contentions that Council acted improperly in relation to the special meeting noticed originally for May 31, 2000. Similarly, it is unnecessary for me to consider arguments attacking the validity of the favorable vote first achieved by the Council.