801 A.2d 1 (2002)
The COUNCIL OF The DORSET CONDOMINIUM APARTMENTS, an unincorporated condominium council organized and existing pursuant to 25 Del. C. §§ 2201, et. seq. Plaintiff Below Appellant,
v.
Edward O. GORDON, Peggy S. Pranzo and Drucilla D. Wetzel, Trustee U/A/D October 27, 1998, Defendants Below Appellees.
No. 238, 2001.
Supreme Court of Delaware.
Submitted: March 26, 2002.
Decided: May 22, 2002.
Daniel R. Losco (argued) and William P. Brady of Losco & Marconi, P.A., Wilmington, Delaware, for appellant.
Benjamin C. Wetzel, III (argued) and Natalie M. Ippolito of Bailey & Wetzel, P.A., Wilmington, Delaware, for appellees.
Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices.
*2 STEELE, Justice.
This appeal arises out of an action initiated by the governing body of the Dorset Condominium Apartments against three of its unit owners. The action sought both injunctive and monetary relief in the Court of Chancery. The Council of the Dorset Condominium Apartments asked the Court of Chancery to grant injunctive relief giving it the right of access to certain units in order to replace the exterior windows and glass sliding doors of those units. In addition, the Council asked the court to enter a judgment requiring the defendant unit owners to pay their proportionate share of the expense assessed for both the window and door replacement project and a separate *3 project for the replacement of the condominium's parking deck.
In his opinion of April 10, 2001, the Vice Chancellor ruled in favor of the Council on the assessment for the parking lot expenses, but found that the Council lacked the authority to impose an assessment for the window and sliding door project.[1] He determined that the exterior windows and sliding doors were neither common elements nor common expenses subject to the control of the Council. Thus, the Court refused not only to grant the requested injunction but also refused to require the defendant unit owners to pay the portion of the special assessment relating to that undertaking.[2] The Vice Chancellor, however, did order each defendant unit owner to pay his or her proportionate share of the parking lot assessment and imposed interest at the legal rate.[3] He declined to award attorneys fees and costs to the Council.[4]
Neither party appeals the assessment for the parking lot expenses. The Council, however, contends that the Vice Chancellor committed legal error when he determined that the Council lacked the authority to undertake the window and door project, further erred when he applied an incorrect interest rate to the parking lot assessment owed and erred when he failed to award attorneys' fees in accordance with the Dorset Code of Regulations (COR). We find the Vice Chancellor's reasoning on the issue of the individual nature of the exterior windows and sliding doors persuasive and therefore affirm that portion of his opinion. We remand the issue of the proper interest rate and the failure to award costs and fees to the Court of Chancery and request that the Court state the basis for its conclusions on these two rulings.

I.
The Dorset Condominium Apartments is a mixed-use condominium established under the Unit Property Act[5] through an Enabling Declaration (the Declaration) dated December 22, 1983. The Council serves as the governing body of the condominium and is elected annually by the Association of Unit Owners, a group comprised of all of the unit owners of the Dorset Apartments. The stated purpose of the Council is to "manage the business, operation and affairs of the Property on Behalf of the Unit Owners in accordance with this Declaration and the COR." The Council's principal contention in this appeal is that the authority to contract for the window and sliding door replacement, as well as to impose the accompanying assessment, falls within this broad mandate and is consistent with the intent of the Dorset's governing documents.
Early in 2000, the Council contracted for the replacement of the Dorset parking deck and the performance of related work on the parking garage. The Council did not submit the issue of the parking contract to a vote of the unit owners and included the cost of that contract in the special assessment at issue in this litigation. In the Court of Chancery, the defendant unit owners contended, inter alia, that the parking deck project was subject to a vote under the terms of Article 12(I)[6] *4 of the Declaration because the work that was performed was an improvement costing over $40,000. The Vice Chancellor determined that the parking area was a common element, but turned aside the defendant owners' argument, finding that the existence of minimal quality differences in the new structure did not constitute an improvement for purposes of Article 12(I).[7] The project thus fell within the Council's Article 12(F) duty to "maintain, repair, and replace" the common elements of the Dorset. Neither the exercise of this duty nor the assessment for its costs requires approval from a majority of the owners. Therefore, the Vice Chancellor held that the Council's assessment for this purpose was valid. As noted supra, although the unit owners chose not to appeal the ruling on the assessment itself, the Council appeals the rate of interest awarded by the Vice Chancellor. This issue is discussed later in this opinion.
In February 2000, the Council proposed replacing the exterior windows and sliding glass doors in the complex. The Council had first recommended this project in November 1998, but the Association rejected the proposal at a special meeting. In its solicitation of votes for the 2000 proposal, the Council estimated that the new contract would cost $600,000, and stated that between $160,000 and $200,000 would need to be spent to repair the existing windows if the proposal failed. The notice read, in part:
Since the Dorset windows and sliding glass doors are common elements, repair and replacement are the Council's responsibility. This was an intentional decision by the originaldevelopers [sic] of the Dorset in order to insure uniform appearance over the building exterior. Thus, window replacement by individual owners is not an option. Because the window replacement will constitute an upgrade costing in excess of $40,000.00 in one year, the consent of the unit owners holding a majority of the pro-rata interests is required for the replacement to proceed.
By April 1, 2000, a slim majority of the Unit Owners had voted in favor of the assessment for window replacement. After this vote, the defendant unit owners solicited the requisite number of signatures to force the Council to call a special meeting of the Association "for the purpose of debate, review and vote on the issue of window replacement; and to institute a super majority vote requirement on special assessments." In this notice for the special meeting, the Council declared, "even if a quorum is achieved and even if a majority of attendees vote in favor of petitioner's proposals, neither of the proposals will be effective." (Emphasis in original). The special meeting was convened on May 31, 2000 and adjourned for lack of a quorum. Immediately thereafter, the Council met and entered into a contract for the window and door replacement.

*5 II.
A condominium declaration and its accompanying code of regulations together form no more than an ordinary contract between the unit owners (and, initially, the developer), created under the statutory framework of the Unit Properties Act.[8] As with any other contract, the intent of the parties to a condominium declaration or code of regulations must be ascertained from the language of the contract.[9] Where that language is clear and unambiguous, this court will accord that language its ordinary meaning.[10]
As the Vice Chancellor noted, our principal inquiry must be into whether or not the assessed cost of replacing the exterior windows and sliding doors was a "Common Expense" under the terms of the Act. Indeed, both the statutory framework and the Dorset Declaration expressly empower the Council to levy those assessments necessary to meet common expenses. The Unit Properties Act defines the term to include the following:
a. Expenses of administration, maintenance, repair and replacement of the common elements.
b. Expenses agreed upon as common by all the unit holders, and
c. Expenses declared common by provisions of this chapter or by the declaration or the code of regulations.[11]
To determine whether or not the windows and doors fall within the category of common elements or are otherwise covered as a common expense, we must look to the language of the Dorset's governing documents.
Article 9 of the Dorset Declaration describes the common elements as consisting of two parts, the general common elements and the limited common elements. The limited elements are listed in the Declaration Plan and generally encompass "outside" items reserved for individual unit use. The general elements are described as consisting of "the entire Property other than the Units and Limited Common Elements." Article 9 then proceeds to list, although admittedly not exclusively, a plethora of items that are considered to be in this category. Neither windows nor sliding doors are mentioned. The description of the unit, however, which Article 9 renders mutually exclusive of the common elements, states that each unit consists of, in part, "the patio and or balcony connected to a Unit (including all doors to leading to such patio or balcony), [and] all windows of a Unit." Because this specific language excludes the windows and doors from the common elements, they similarly cannot be considered a common expense under Section 2202(4)(a) of the Unit Property Act.[12]
We must next examine whether the terms of the Declaration and the COR provide for the inclusion of the widows and doors as a common expense, despite the fact that they are not among the common elements. As an initial matter, we find that Section 2202(4)(b)[13] is inapplicable to the case before us, and therefore we need not discuss it in any detail. We note, however, that the Vice Chancellor correctly *6 pointed out that subpart (b) "would seem to require unanimous agreement among unit owners,"[14] and the very existence of this litigation indicates a lack of unanimity. The Council argues strenuously that the subpart (b) is indeed relevant because the language of the Declaration omits the term "all" from a similar provision, rendering the unanimity requirement inoperable. Although we will address this argument more fully infra, our examination, like the Vice Chancellor's, is under subpart (c), which governs all expenses declared common by operation of the Declaration or COR.[15] The narrow purpose of subpart (b) is to allow the body of unit owners to unanimously agree to treat as common "any expense," notwithstanding any contrary or ambiguous provision of a condominium's governing documents.
Despite the Council's misconception of the appropriate statutory framework for examining the effect of the Declaration and COR on this dispute, we wholly agree that Delaware's Unit Property Act in no way prohibits an enabling declaration from adopting a different definition of the term "common expense" than that in the statute. Indeed, the very purpose of Section 2202(4)(c) is to authorize a different or expanded definition of common expenses in the Declaration and COR. The Council raises two arguments in support of its position that the governing documents provide for the windows and sliding doors to be treated as a common expense. The first is that the replacement of the windows and doors falls within the Council's broad duty to maintain the exterior of the building. In the second, it contends that the governing documents for the Dorset authorize the majority owners to establish any item as a common expense by a simple majority vote.
The Council contends that Article 13 of the Declaration authorizes it to replace the windows as part of its duty to maintain the exterior of the building. Article 13(B)(2) states that the Council has responsibility "to repair, maintain or replace... [a]ll portions of a Unit which constitute a part of the exterior of the Building including any balcony or patio." Moreover, Article 13(C)(1) prohibits the Unit Owner from maintaining, repairing or replacing the portions of the Unit mentioned in Article 13(B). On its face, this appears to include the exterior windows, and the Vice Chancellor concluded that they were, indeed, part of the exterior.[16] Ultimately, however, this Court could confirm the Council's position only if we were to ignore the plain language in the Declaration that specifically places the windows and doors of the unit within the province of the unit owner. Article 13(C)(5) requires that the owner "maintain, repair and replace... all non-load bearing interior walls, floor, and partitions and windows and doors in such Unit." The Council argues that the term "interior" modifies not only the non-load bearing walls, floors and partitions, but also the windows and doors of the Unit. An ordinary reading of this clause, utilizing the most common rules of grammar, indicates that the word "interior" can only modify "walls, floors and partitions," while the phrase "windows and doors" must comprise a distinct, unmodified term. Therefore the Vice Chancellor correctly concluded that the language of Article 13(C)(5) carves out the windows and sliding doors from the exterior items for which the Council bears responsibility. *7 This interpretation is consistent with the specific inclusion of two parts of the unit  the balcony and patio  under the Council's Article 13(A) and 13(B)(2) maintenance responsibility; neither of these clauses mentions the exterior windows and sliding doors.
A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.[17] We nevertheless cannot agree with the Council's argument that the Vice Chancellor's interpretation is inconsistent with Article 13(C)(2). The Council stresses that Article 13(C)(2) requires that the owners maintain, but not replace and repair, the "interior surfaces of ... doors, door frames, windows, window frames and vents within the Unit." It contends that the "interior surfaces" language is redundant if the Declaration also requires that unit owners "maintain, repair and replace" all components and surfaces of the same windows and doors. Article 13(C)(2), however, states in full: "It shall be the responsibility of the Unit Owner ... [t]o paint, wallpaper, decorate and maintain the interior surfaces of all walls, ceilings, and floors, doors, door frames, windows, window frames and vents within the Unit and to keep clean any balcony or patio area within the Unit." This subsection clearly relates to the duty of each unit owner to maintain the appearance of the unit. On the other hand, Article 12(C)(5) outlines the duty of the unit owner to maintain the structural integrity and mechanical functionality of his unit. Because these items discuss two wholly independent responsibilities, their terms are not redundant on their face.
We also cannot agree with the Council's second argument that the Declaration and COR allow for a simple majority vote to authorize an expense as common.[18] Article 2(D)(1) of the Declaration defines common expenses as those "agreed upon as Common Expenses by the Unit Owners pursuant to the Declaration and Code of Regulations." The Council asserts that this authorizes a majority of the owners to declare any expense common by an ad hoc vote. This argument is tenable only if we were to ignore the phrase "pursuant to the Declaration and COR" contained in Article 2(D)(1). Under Article 2 of the COR, the unit owners have the authority to act instead of the Council only when that authority is specifically provided for in the Declaration and the Unit Property Act. As the Vice Chancellor correctly discussed in a footnote, Article 12(I) is the only provision in either of the governing documents that in any way empowers the owners to "create" a common expense.[19] Because Article 12(I) applies only to improvements in the common elements, it is irrelevant here.
The Council contends, on the contrary, that Article 2(D)(1), when read with other parts of the organizational documents, allows a mere majority of the unit owners to authorize the Council to invade the property interest of an individual owner, despite the lack of any provision to this effect. Specifically, the fact that Article 2(B)(5) of the COR states that the owners may "transact such other business at such [annual] meetings as may properly come before them" does not give the majority *8 carte blanche to conduct any business it chooses. The existence of the phrase "as may properly come before them" presupposes that the contemplated owner action is explicitly authorized somewhere in the Declaration, COR, or the Unit Property Act. In the documents before us in this case, it is not.
Even if we were to ignore our long-standing precedent[20] and twisted the language of the governing documents to allow a mere majority of unit owners to declare any expense common, the Court of Chancery would almost surely find the vote in this instance to be fatally flawed. The record clearly indicates that the Council failed to present squarely to the owners the issue of whether they should consider the replacement of the exterior windows and sliding doors to be a common expense. The notice the Council provided the owners before the Spring 2000 vote specifically stated that the windows and sliding doors were already common elements and that the vote of the owners was required under Article 12(I) because the work would upgrade the current windows and doors. Nothing in the notice would have led the owners to believe that they were affirmatively ceding control over the windows and doors of their units to the Council.
This Court recognizes that the language in the Dorset's governing documents demands that the provisions of those documents be "liberally construed" to create "a uniform plan for development and operation" of the condominium. We certainly understand the benefit that a uniform exterior would likely present to the ownership group as a whole. Yet even as we can conceive of a policy that supports the Council's ultimate goal of employing unfettered discretion to preserve every part of the Dorset complex that is within the public eye, the liberal construction of any contract is necessarily limited by the terms of the document. Here, the Declaration and COR are clear that the right to replace exterior windows and sliding doors rests with each individual unit owner. It is not within our purview to add unilaterally to the terms of an agreement to strengthen its perceived goal.
Moreover, even under the restrictive terms of the Dorset's Declaration and COR, the Council retains the right to maintain an essentially uniform exterior appearance. Articles 13(A) and 13(C)(4) of the Declaration restrict the marginal unit owner from subjecting his neighbors to a truly incongruous appearance by requiring every unit owner to first obtain the written permission of the Council before performing any repair or replacement work on the exterior of his unit. This caveat sufficiently preserves the appropriate balance between the property interest of the owner and the stated desire that the Council be allowed to create and maintain a uniform plan for the condominium for the benefit of that community. Because the Declaration protects the communal property interest in the Dorset building, we see no reason to ignore its terms for policy reasons.

III.
The Vice Chancellor's ruling requires that each of the Appellee-defendant unit owners, remit to the Dorset that portion of the special assessment that related to the replacement of the parking deck, including interest at the "legal rate."[21] The legal rate is defined as the prime rate plus five percent (5%) and all parties agree that the ten percent (10%) rate applied by the Vice *9 Chancellor in his May 8, 2001 order is the appropriate "legal rate." The Council, however, contends that the proper rate is not the legal rate, but rather the eighteen percent (18%) allowed by the Unit Property Act. The Act states that all sums properly assessed against a unit shall constitute a charge against that unit and that the unit owner is personally liable for any assessment due "together with interest thereon not to exceed 18% per annum."[22] Article 9(A)(4) of the Dorset COR obliges any unit owner who is delinquent in paying any assessed common expenses to pay interest on the amount due at the highest rate permitted by law, "unless such interest is waived by the Council." Because the Vice Chancellor's opinion does not disclose any rationale for applying the legal rate as opposed to the interest rate the Council requested, we reverse and remand on this issue and request that he specify on remand the rationale for his conclusion.
Similarly, the Vice Chancellor's opinion offers no basis for his denial of Plaintiff's additional costs and expenses, including attorneys' fees.[23] We also reverse and remand this aspect of the Court's judgment and request specific findings related to Article 9(A)(2) of the COR, which appears to entitle the prevailing party "to recover the costs of the proceeding, and such reasonable attorneys' fees as may be determined by the court."
The judgment of the Court of Chancery is affirmed in part, and reversed and remanded in part. The Court of Chancery shall file its report within 30 days on the portion of this matter remanded. See Sup. Ct. R. 19. Jurisdiction is retained.
NOTES
[1] The Council of the Dorset Condominium Apartments v. Gordon, Del. Ch., 787 A.2d 723 (2001) (hereinafter Chancery Opinion).
[2] Id. at 730, 732.
[3] Id. at 732.
[4] Id.
[5] Del.Code Ann. tit. 25, ch. 22 (1989).
[6] Article 12(I) provides:

[W]henever in the judgment of the Council the Common Elements shall require additions, alterations or improvements costing in excess of Forty Thousand Dollars ($40,000) and the making of such additions, alterations or improvements shall have been approved by a majority of the Unit Owners, the Council shall proceed to assess all Unit Owners the cost thereof as a Common Expense.
[7] The Vice Chancellor concluded that the new deck was essentially the same as the old with the exception of superior waterproofing. He found that the evidence clearly showed that the old decking had reached the end of its useful life and that nothing in the record suggested that the water proofing quality of the new decking was the reason the project was undertaken or that it materially contributed to an increase in the cost. Chancery Opinion at 728.
[8] See Linden Knoll Condominium Ass'n v. McDermott, Del. Super., C.A. No. 93C-03-090, 1994 WL 555361, Del Pesco, J. (Aug. 19, 1994) (applying general rules of contract interpretation to the interpretation of a condominium's governing documents).
[9] Citadel Holding Corp. v. Roven, 603 A.2d 818, 822 (Del.1992),
[10] Id.
[11] Del.Code Ann. tit. 25 § 2202(4) (1989).
[12] Id.
[13] Id.
[14] Chancery Opinion at 729.
[15] See Footnote 11, supra; see also Chancery Opinion at 729.
[16] Chancery Opinion at 729-30.
[17] Warner Communications Inc. v. Chris-Craft Indus., Inc., 583 A.2d 962, 971 (Del.Ch.1989), aff'd, 567 A.2d 419 (Table) (Del.1989).
[18] The Vice Chancellor's opinion suggests that, at trial, this argument was made only in passing. Chancery Opinion at 731, n. 14.
[19] Id.
[20] See, e.g., Rhone-Poulenc Basic Chems. Co. v. American Motorists Ins. Co., 616 A.2d 1192, 1195 (Del.1992).
[21] Chancery Opinion at 731.
[22] Del.Code Ann. tit. 25 § 2233 (1989).
[23] Chancery Opinion at 731.