IN THE SUPREME COURT OF THE STATE OF DELAWARE

BETHANY MARINA                 §
TOWNHOUSES PHASE II            §
CONDOMINIUMS, INC.,            §
                               §    No. 2, 2017
     Petitioner Below,         §
     Appellant,                §    Court Below: Superior Court
                               §    of the State of Delaware
     v.                        §
                               §    C.A. No. S15-C-01-019
BMIG, LLC,                     §
                               §
     Respondent Below,         §
     Appellee.                 §

Submitted:  September 20, 2017
Decided:    October 10, 2017

Before **VALIHURA**, **VAUGHN**, and **SEITZ**, Justices.

## **ORDER**

This 10th day of October, 2017, having considered the briefs and the record below, it appears to the Court that:

(1)    Bethany Marina Townhouses Phase II Condominiums, Inc. ("Condo Association"), a condominium owners association located in Ocean View, Delaware, and BMIG, LLC, a successor in interest to the original condominium developer, have each appealed a Superior Court's decision addressing disputes between the parties over development rights and assessments in the condominium complex.  In this order, we affirm the Superior Court's judgment that (a) the land

designated for the eleven undeveloped units was expressly excluded from the condominium Declaration, and thus BMIG may develop the land into eleven condominium units as contemplated by the Declaration Plan; (b) the easement granting the developer the right to build the additional eleven units remains in force; and (c) BMIG must pay all future assessments for boat slips it owns, as well as costs, including interest, associated with collection. We reverse, however, the Superior Court's ruling that BMIG owns the land dedicated to five condominium features— the pumping station, pump house, pool, pool house, and stormwater management ponds.

(2)     Bethany Marina, Inc. is the original developer of the condominium complex. It recorded a declaration on February 14, 1996, establishing a plan to develop seventy-seven units on 10.57 acres as a condominium complex in Sussex County, Delaware ("Declaration"). The Condo Association was the incorporated condominium association for the complex. After encountering financial troubles while building the project, in February 2005, Bethany Marina, Inc. sold its interest as developer to Spicer/Hill through a liquidating trust. Spicer/Hill purchased the interest with loans from K Bank. Spicer/Hill also ran into financial troubles, and in 2008, K Bank foreclosed the mortgage and sold all interests as developer to BMIG, LLC, the current developer ("BMIG" or "Developer").

2

(3)     The Declaration established an "expandable" condominium complex with the intent to develop the property in two phases.[1] Phase One included the land described in Schedule A attached to the Declaration encompassing "all improvements and recreational amenities thereon, together with the one (1) building composed of six (6) units"[2] described in Schedule B.  Phase Two included "the remaining fourteen (14) additional buildings to be built in the future on the land described and excepted from submission under the Unit Property Act as identified and designated by unit number in Schedule A, composed of seventy-seven (77) units."[3]  The Declaration did not define the specific metes and bounds of the undeveloped parcels but did identify their locations in the Declaration Plans.[4]

(4)     At the time the developer filed the Declaration, the condominium "consist[ed] of six (6) units located in one building."[5]  The land required to build the additional fourteen buildings and seventy-seven units of Phase Two was expressly excluded from the Declaration.[6]  The developer contemplated that as the seventy-

---

[1] App. to Opening Br. at 17 (Declaration ¶ 3) ("This condominium . . . shall be an expandable condominium as hereinafter provided for."); *Town of Windham v. Lawrence Sav. Bank*, 776 A.2d 730, 732 (N.H. 2001) ("By declaring an expandable condominium, a developer may submit land to the condominium while reserving the right to expand the condominium by later adding more land.").

[2] App. to Opening Br. at 17 (Declaration ¶ 2(v)).

[3] *Id.* (Declaration ¶ 2(w)).

[4] *Id.* at 77–109.

[5] *Id.* at 20 (Declaration ¶ 6(a)).

[6] *Id.* at 32 (Schedule A) (excepting from the Declaration "the parcels of land required to build the proposed additional buildings consisting of seventy-seven (77) additional units"); *see Ryan James Realty, LLC v. Villages at Chester Condo. Ass'n*, 893 A.2d 661, 664 (N.H. 2006) ("If the

3

seven units were built and sold, it would annex the land to the condominium to include the new units by filing amendments to the Declaration. The developer's right to annex land for the unbuilt units under the Declaration appears under the heading "Expansion":

> (a)    Right to Expand.  The Developer and any successors in title thereto shall have the absolute right, without consent of the Council or any Unit Owner or the holder of any lien on any Unit, at any time and from time to time, to be exercised prior to the 29th day of August, 2005, to annex to the land and the improvements constituting the property of BETHANY MARINA TOWNHOUSES PHASE II CONDOMINIUM, as the same are described and identified by legal description on Schedule A . . . . [A]nd thereby to submit to each and everyone [sic] of the provisions of this Declaration and the Unit Property Act, any land owned by the Developer which is currently excepted out and from submission under the Unit Property Act, and which land underlies the remaining units to be built as excepted on said Schedule "A."[7]

The deadline to annex land to the condominium complex without unitholder consent was later extended to August 29, 2010.[8]  After the expiration date, the Declaration and the Unit Property Act require the developer to obtain the consent of all unitholders before further annexing any land.[9]

---

condominium is an 'expandable condominium,' the declaration must contain an explicit reservation of the option to add land to the condominium, a legal description of the 'additional land,' which is the land that may be added to the condominium, and numerous other provisions.").

[7] App. to Opening Br. at 18 (Declaration ¶ 5(a)).

[8] *Id.* at 71.  The Seventh Amendment was "erroneously titled as [the] Sixth Amendment." *Id.* at 73.

[9] *Id.* at 27–28 (Declaration ¶ 20); 25 *Del C.* § 2229.  The parties have assumed, as has the Court, that the Unit Property Act, 25 *Del. C.* § 2201 *et seq.*, and not the Delaware Uniform Common Interest Ownership Act, 25 *Del. C.* § 81-101 *et seq.*, applies to their disputes under the Declaration.

4

(5)   The Declaration also included an easement to build the undeveloped parcels, which was "perpetual during the continued existence" of the condominium.[10]  The Developer reserved:

> an easement to construct fourteen (14) buildings and the remaining portion of the first building as delineated on the said Declaration Plan, and all of the necessary parking lots, walks, and other appurtenances requisite to service some or all of said fourteen (14) buildings and the remaining portion of the first building and to provide for the necessary ingress and egress to said building.[11]

(6)   Over time the developer executed a series of eight amendments to the Declaration.  The original Declaration and seven of the amendments submitted the land and improvements associated with completed units to the condominium Declaration.[12]  As the amendments were recorded, they continued to except out of the Declaration the "parcels of land required to build the proposed additional buildings."[13]  Further, in the Declaration and all amendments submitting land, the developer excepted out the "pumping station" and "pump house."[14]  The third and subsequent amendments submitting land also excepted out the "pool," "pool house,"

---

[10] *Id.* at 35–36.
[11] *Id*. at 36 ("Grant of Easement").
[12] The seventh amendment extended the expiration date for the Developer's right to unilaterally annex units and amend the Declaration. *Id.* at 71–72.  All other amendments submitted land and improvements associated with developed units. *Id.* at 42–70, 73–76.
[13] *Id.* at 32, 42, 46, 51, 56, 62, 68.
[14] *Id.*

5

and "storm water management pond[s]."[15]  After the eighth and final amendment, there were three undeveloped buildings not subject to the Declaration, with the units identified as numbers 51 through 53, 60 through 64, and 112 through 114.

(7)     In June of 2014, BMIG began to develop one of the remaining parcels. The Condo Association objected, informing BMIG that the right to add land to the condominium expired on August 29, 2010, and that the Declaration prohibited further development without the existing unitholders' approval.

(8)     As to the boat slip assessments, when BMIG purchased the interest as developer of the condominium project, it also purchased eleven boat slips, identified as I, M, S, 158 through 164, and 172.[16]  On October 25, 2011, the Condo Association filed a complaint against BMIG seeking payment for past assessments associated with ownership of the boat slips, totaling $25,250.  The parties settled on December 21, 2011.  BMIG paid $21,760 and, according to the language of the settlement agreement, "confirm[ed] and agree[d] that it is obligated to pay, and shall pay, any and all future monthly assessments for the boat slips due and owing under the

---

[15] *Id.* at 51, 56, 62, 68.  The amendments use "pond" in the singular, while BMIG argues it is entitled to "ponds" plural. Answering Br. at 31.  There are three ponds in the Declaration.  Because our conclusion is the same regardless, we assume the ownership of all three ponds is at issue.
[16] *Id.* at 173–74.

6

Declaration and Code of Regulations."[17] BMIG failed to pay any assessments after the settlement. As of December 31, 2015, the assessments due totaled $35,370.41.[18]

(9) On November 27, 2014, the Condo Association filed a petition in the Court of Chancery requesting (1) specific performance of payment for future condominium assessments and (2) payment of condominium assessments due and owing under the Declaration. BMIG filed a motion to dismiss for lack of subject matter jurisdiction, alleging the claim sought a legal remedy for breach of contract and not specific performance.[19] The Condo Association stipulated to transfer the proceedings to the Superior Court. BMIG filed its answer and counterclaim, seeking declaratory relief for rights to develop the undeveloped parcels, ownership of five condominium features, and the validity of the easement. Both parties filed for summary judgment based on a stipulated record.

(10) The Superior Court held BMIG could develop the eleven remaining parcels free of the Declaration's restrictions because the land associated with the unbuilt units was expressly excepted from the Declaration and subsequent amendments. According to the court, the August 29, 2010 deadline to submit land to the condominium had no effect on BMIG's development rights, and thus the unitholders' consent was not required to build the units. The Superior Court also

---

[17] App. to Answering Br. pt. 2 at 283, ¶¶ 2(D), 5.
[18] *Bethany Marina Townhouses Phase II Condos., Inc. v. BMIG, LLC*, 2016 WL 4016759, at *2 (Del. Super. Ct. July 27, 2016).
[19] App. to Appellant's Reply Br. at 22.

held BMIG could enforce the easement to build on the undeveloped parcels because the easement continued in force as long as the condominium development existed. In addition, the Superior Court held BMIG owned the pumping station, pump house, pool, pool house, and stormwater management ponds because they were excepted from the Declaration as amended. Lastly, the court required BMIG to pay the assessments, legal costs, late fees, and rebilling fees because BMIG agreed to pay all future assessments in the Settlement Agreement and thus "ha[d] no defense" to the Condo Association's claim.[20] Both parties appealed. This Court reviews the Superior Court's order granting summary judgment *de novo*.[21]

(11) The Declaration controls the relationship between the Condo Association and BMIG, as Developer.[22] "As with any other contract, the intent of the parties to a condominium declaration or code of regulations must be ascertained from the language of the contract. Where that language is clear and unambiguous, this court will accord that language its ordinary meaning."[23] Our responsibility, therefore, is to interpret the plain language of the Declaration as it pertains to the land, easement, and features.

---

[20] *Bethany Marina Townhouses Phase II Condos., Inc.*, 2016 WL 4016759, at *2.
[21] *Lank v. Moyed*, 909 A.2d 106, 108 (Del. 2006).
[22] *Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 5 (Del. 2002) ("A condominium declaration and its accompanying code of regulations together form no more than an ordinary contract between the unit owners (and, initially, the developer), created under the statutory framework of the Unit Properties Act.").
[23] *Id.*

8

(12) The Condo Association argues the Superior Court erred in finding BMIG had the right to develop the remaining land. The Condo Association points to paragraph 5(a)'s fixed deadline to annex land and improvements to the condominium without the consent of the condominium council or the unitholders.[24] According to the Condo Association, once the deadline expired, BMIG lost the rights to develop the excluded land. The Condo Association also argues that Schedule A of the Declaration limited the excepted property to the land "required to build" the remaining unbuilt condominium units.[25] Because the deadline passed to annex land to the condominium without further unitholder consent, the argument goes, there were no longer any units to add and thus no land "required" to build them. Thus, the Condo Association contends, BMIG's right to develop the parcels "for any purpose" expired.[26]

(13) BMIG concedes the deadline expired to expand the condominium without consent, but argues it does not affect BMIG's right to build out the remaining undeveloped parcels in the condominium. We agree. Under paragraph 5(a) of the Declaration, the Developer can

> annex to the land . . . [and] submit to each and every one of the provisions of this Declaration and the Unit Property Act, any land owned by the Developer and which is currently excepted out and from

---

[24] App. to Opening Br. at 18 (Declaration ¶ 5(a)).
[25] *Id.* at 32 (Schedule A).
[26] Opening Br. at 12.

9

submission under the Unit Property Act, and which land underlies the remaining units to be built . . . .[27]

Once the deadline expired, unitholder consent was required to add the undeveloped units to the condominium complex. But, BMIG does not seek to add the land and unbuilt units to the condominium regime. Instead, BMIG intends to develop the land and unbuilt units independent of the condominium established by the Declaration. Thus, the deadline has no effect on BMIG's development rights.[28]

(14)    The Condo Association also argues that, under the Declaration, the unitholders were "assured there would be no further development" after the expiration date when they purchased their units.[29]   A plain reading of the Declaration, however, shows the unitholders were only assured that after August 29,

---

[27] App. to Opening Br. at 18 (Declaration ¶ 5(a)).

[28] *See N & P Partners, LLC v. Council of Unit Owners of Bayberry Woods Condominium*, 2006 WL 456781, at *2 (Del. Ch. Feb. 22, 2006) (finding where partners had not submitted the land to the condominium regime, they continued as the sole owners of the two parcels). Commentators are in agreement with this interpretation.  One treatise explains, "[t]he developer who has not been contractually obligated to construct the later phases and add them to the condominium may decline to do so and use the land for other purposes . . . ."  Richard Linquanti, Specific Types of Condominiums, Fl. Condo. & Cmty. Ass'n L. § 5.24 (Fl. Bar, 3d ed. 2016).  Another commentator notes that "rarely will the condominium owners want the developer to build new units that are not a part of the original condominium (and thus beyond the board's ability to enforce compliance with condominium's restrictions)."  Kuehnle, et al., Oh. Condo. L. § 11:5 Timing Limitations (2016); Kuehnle, et al., Baldwin's Oh. Prac. Real Est. § 30:29 Timing Limitations (Mar. 2017). The solution taken by condominium associations, he notes, is either to extend the Developer's deadline to annex units or to decide "that it is in the best interest of the association to purchase the property."  Kuehnle, et al., Oh. Condo. L. § 11:5 Timing Limitations (2016).  After the right to unilaterally annex land expires, the property "can only be purchased by and conveyed to the association"—it cannot be conveyed unilaterally.  *Id.* § 23.1 Authority to Purchase and Sell Real Estate.

[29] Opening Br. at 19.

10

2010, no further units would be annexed to the condominium without their consent.[30]

Thus, we affirm the Superior Court's decision that BMIG may develop the parcels to construct additional units.[31]

(15) As to the easement, the Condo Association argues the Superior Court erred in holding BMIG can use the easement to construct the units. The Declaration granted the developer an easement "to construct fourteen (14) buildings . . . and to provide for the necessary ingress and egress to the said building[s]."[32] The Superior Court noted that "[t]he easement itself has no time limitation for construction."[33] And the Declaration states the easement is "perpetual during the continued existence" of the condominium—which still exists.[34] The Condo Association

---

[30] One treatise explains that when future phases are voluntary on the part of the Developer, the Declaration must put unitholders on notice that the development is not guaranteed. LINQUANTI, at § 5.50. The Declaration consistently describes the undeveloped parcels as "proposed" additional units, which put the existing and future unitholders on notice of their possible but not guaranteed development status.

[31] We note that BMIG is not free to develop the parcels however it sees fit. In the Declaration, the developer reserved the land for the sole purpose of developing additional units in accordance with the condominium regime. Thus, further development of the unbuilt parcels is limited to the construction of units contemplated by the Declaration plan, including its architectural guidelines. Whether these units are annexed to the condominium is at the discretion of the Condo Association. In addition, the Condo Association argues the Declaration does not specify the precise locations of the parcels, and thus "it is unclear how such lands could ever be identified." *Id.* at 23 n.3. But as the Superior Court noted, the Declaration Plans contain sufficient detail to determine the parcels' locations. *Bethany Marina Townhouses Phase II Condo., Inc.*, 2016 WL 4016759, at *1. Property is insufficiently described when there is no "information from which one can determine a description of the property." *Caswell Cove Condo. Ass'n, Inc. v. Milford Partners, Inc.*, 753 A.2d 361, 364–65. (Conn. App. 2000). Here, the Declaration Plans provide sufficient information to determine the parcels' locations.

[32] App. to Opening Br. at 35.

[33] *Bethany Marina Townhouses Phase II Condominium, Inc.*, 2016 WL 4016759, at *2.

[34] App. to Opening Br. at 36.

11

concedes that the easement was "strictly tied to future development of the condominium," but argues that it expired when BMIG's right to develop the property expired. BMIG's right to develop the property did not expire, and thus neither did the easement required to complete the development.[35] We affirm the Superior Court's decision that the easement remains in effect.[36]

(16) Turning to the features in the condominium complex, the pump house and pumping station were excepted from the condominium in the Declaration and all subsequent amendments. But the original Declaration Plan, dated January 23, 1996, states the pumping station is "to be conveyed to Sussex County."[37] And the First Amended Declaration Plan, dated February 21, 1996, and all subsequent plans confirm that it was "conveyed to Sussex County."[38] The Second Amended

---

[35] *Cf. Harbour Pointe, LLC v. Harbour Landing Condo. Ass'n, Inc.*, 2009 WL 455731, at *8 (Conn. Super. Ct. Jan. 23, 2009), *aff'd*, 14 A.3d 284 (Conn. 2011) (holding that if the reserved property was "not added to the Association they would be benefited by an easement across Association property"); *Caswell Cove Condominium Ass'n, Inc.*, 753 A.2d at 365 (holding that the Developer did not have the right to the undeveloped property and thus did not have the right to the associated easement).

[36] Because the perpetual easement also provided the "necessary ingress and egress to said building," the easement will remain after development as necessary to access the units. App. to Opening Br. at 36. We note that "it is the duty of the owner of the easement . . . to maintain and repair the easement." *Porter v. Delmarva Power & Light Co.*, 1990 WL 47352, at *4 (Del. Super. Ct. Apr. 6, 1990). Thus, "those entitled to use land subject to an easement jointly have obligations for maintenance proportional to their use." *Sandie, LLC v. Plantations Owners Ass'n, Inc.*, 2012 WL 3041181, at *9 (Del. Ch. July 25, 2012).

[37] App to Opening Br. at 77–78.

[38] *Id.* at 91–92. In addition, shading indicates property excepted. The pumping station is not shaded in any of the Declaration Plans.

Declaration Plan and all subsequent plans state the pump house is "to be removed."[39]

Thus, if the notes on the Declaration Plans are accurate, the Developer does not own

the land associated with these features and cannot reclaim them by later amendment.

But if the notes on the Declaration Plans are not accurate, then they belong to BMIG

because they were excepted from the condominium in the Declaration and all

relevant amendments.

(17)   As for the pool, pool house, and stormwater management ponds, the

Declaration Plans establish their locations on condominium property prior to being

excepted.[40]  In *Council of Unit Owners of Pilot Point Condominium v. Realty Growth

Investors*,[41] the Court of Chancery explained that buildings constructed on already

submitted land belonged to the condominium and thus were subject to its declaration

and the Unit Property Act.[42]   Similarly, the pool, pool house, and stormwater

---

[39] *Id.* at 93–94.  The original and First Amended Declaration plans do not state the pump house is to be removed.  *Id.* at 77–78, 91–92.  In addition, the pump house is not shaded in the original and First Amended Declaration Plans, but it is shaded in all subsequent plans.

[40] The Second Amended Declaration Plan established the location of the first stormwater management pond on May 4, 1998, and the Third Amended Declaration Plan established the location of the other two on July 7, 1998.  *Id.* at 51, 93–96.  The Fourth Amended Declaration Plan established the location of the pool and pool house on February 4, 2000.  *Id.* at 100.  All three features were established on condominium property, and these plans were executed before the third amendment was executed on February 24, 2000, which was the first document to state these features were excepted.  *Id.* at 51.

[41] 436 A.2d 1268, 1279 (Del. Ch. 1981), *aff'd*, 453 A.2d 450 (Del. 1982).

[42] *Id.* ("In this situation, the entire 17.35 acre tract was submitted to the provisions of the Act. When the 28 Phase I town houses were subsequently constructed on a portion of the tract, they of necessity had to become unit property subject to the provisions of the Act.  The only thing that is lacking is that the declaration has not been properly amended for record so as to reflect the proportionate undivided interest of those 28 units in the common elements.").

management ponds were constructed on submitted condominium land before the third amendment attempted to except them out. Consequently, the unitholders had a percentage interest in the features that could not be revoked without their consent.[43] Thus, we reverse the Superior Court's ruling that these features were on land validly excepted from the Declaration.

(18) Turning to the Superior Court's decision granting the Condo Association's Motion for Summary Judgment, BMIG argues first that the Superior Court erred in asserting jurisdiction because the transfer of the case from the Court of Chancery to the Superior Court did not "automatically transform" the specific performance claim into a breach of contract claim.[44] According to BMIG, the Condo Association did not amend its pleadings to specifically assert a breach of contract claim instead of a claim for specific performance, and therefore the Superior Court did not have jurisdiction.[45] This Court, however, determines subject matter jurisdiction by examining "the allegations in the complaint viewed in the light of what the plaintiff actually seeks and not necessarily what is pleaded."[46] Here, the

---

[43] 25 *Del C.* § 2229; App. to Opening Br. at 27–28 (Declaration ¶ 20).

[44] Appellee's Opening Br. at 39; *see Chavin v. H. H. Rosin & Co.*, 246 A.2d 921, 922 (Del. 1968) ("The right to compel the specific performance of a contract is a purely equitable remedy, and is given in substitution of the legal remedy of compensation when it is inadequate.").

[45] *Anguilla Re, LLC v. Lubert-Adler Real Estate Fund IV, L.P.*, 2012 WL 1408857, at *5 (Del. Super. Ct. Mar. 28, 2012) ("[T]his Court does not have subject matter jurisdiction to order specific performance.").

[46] *Chateau Apartments Co. v. City of Wilmington*, 391 A.2d 205, 207 (Del. 1978).

Condo Association seeks a legal remedy for breach of contract. In addition, BMIG acknowledged this when it moved to dismiss the case from the Court of Chancery because "the alleged wrong [was] a past breach of contract and anticipated breach of contract."[47] Thus, the Superior Court properly asserted jurisdiction over the legal claims.

(19) Second, BMIG argues the Settlement Agreement "does not create a contractual obligation for BMIG to pay *all* future assessments," but only those "due and owing under the recorded condominium documents."[48] Because the Code of Regulations exempts the Developer from paying assessments,[49] argues BMIG, no assessments are "due and owing."

(20) "When interpreting a contract, the Court will give priority to the parties' intentions as reflected in the four corners of the agreement."[50] The court must construe the agreement as a whole, "giving effect to all provisions therein."[51] "The meaning inferred from a particular provision cannot control the meaning of the entire agreement if such an inference conflicts with the agreement's overall scheme

---

[47] App. to Appellant's Reply Br. at 22.
[48] Answering Br. at 41 (emphasis added); App. to Answering Br. pt. 2 at 283, ¶¶ 2(D), 5.
[49] App. to Answering Br. pt. 1 at 124, § 2.
[50] *GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).
[51] *Id.*

15

or plan."[52]  When reading the settlement agreement as a whole, the overall scheme reflects the parties' understanding that BMIG would pay all future assessments.

(21)   Paragraph 2(D) states that BMIG "agrees to pay all future assessments in a timely manner."[53]  Paragraph 4 allows BMIG to lease its boat slips "as long as it is current in payment of the boat slip assessments."[54]  Paragraph 5 states that BMIG's "obligation to pay any and all boat assessments" is independent of other disputes; and that "in no event may [BMIG] withhold payment of the assessments."[55] The reasonable interpretation of these clauses, when taken in combination, is that BMIG agreed to pay all future assessments regardless of the circumstances.

(22)   Third, BMIG argues that if it is obligated to pay the assessments, the obligation arises from the Settlement Agreement alone because BMIG is exempt from paying assessments under the Code of Regulations.  According to BMIG, because the Settlement Agreement does not provide for the payment of interest or fees, BMIG does not have to pay those costs.  When BMIG agreed to pay all future expenses, however, it submitted itself to the penalties for nonpayment under the governing documents.  Under the Code of Regulations, when the condominium obtains a judgment for the nonpayment of assessments, "such judgment shall include

---

[52] *Id.*
[53] App. to Answering Br. pt. 2 at 283, ¶ 2(D).
[54] *Id.* at 283, ¶ 4.
[55] *Id.* at 284, ¶ 5.

16

interest at the maximum amount . . . , reasonable attorneys' fees to obtain and enforce such judgment, and costs as fixed by the Court."[56] Thus, we affirm the Superior Court's decision requiring BMIG to pay the boat slip assessments and associated costs.[57]

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court is AFFIRMED in part and REVERSED in part.

BY THE COURT:

/s/ *Collins J. Seitz, Jr.*
Justice

---

[56] App. to Answering Br. pt. 1 at 125, § 5.
[57] BMIG also argued it is not liable for boat slips I, M, and S, because they do not belong to the condominium association. But slips I, M, and S were included in the Settlement Agreement, and therefore BMIG must pay for them.