Neel, Stephen E., J.
Plaintiff Celanese Corporation (Celanese) seeks money damages and declaratory judgment against defendant OneBeacon America Insurance Company (OneBeacon) under general liability policies which Celanese purchased from OneBeacon’s predecessor, Commercial Union Insurance Company. Celanese alleges that OneBeacon has failed to provide payment under the policies for defense costs and indemnification of asbestos-related and other bodily injury claims. Each party has moved for partial summary judgment with regard to OneBeacon’s duty to defend. In addition, OneBeacon had moved for partial summary judgment regarding choice of law and availability of relief under G.L.c. 93A, and Celanese has moved for partial summary judgment as to several of OneBeacon’s affirmative defenses. After hearing, and consideration of the materials presented by the parties, the Court rules as follows.
I. Duty to Defend
Celanese and OneBeacon both move for summary judgment with regard to their respective rights and obligations regarding OneBeacon’s duty to defend under the insurance policies identified in the Second Amended Complaint (the policies), in light of two subsequent defense cost sharing agreements: the February 1998 “Defense Cost Sharing Agreement Between Commercial Union and Hoechst Celanese Corporation” (1998 agreement), and the May 2001 “Defense Agreement Between Celanese and Celanese Insurers Regarding Photo Resist Claims” (2001 agreement) (the agreements).
The agreements were part of an effort to resolve, without litigation, disputes among Celanese and its several insurers, including OneBeacon, over funding of defense costs for bodily injury claims against Celan-ese arising out of its products containing asbestos or certain chemicals (1998 agreement), or out of “photo resist” chemicals used in computer parts manufacture (2001 agreement). The agreements contemplated that Celanese and its insurers, including OneBeacon, would fund the defense costs of specified claims by splitting the costs among the parties, Celanese included.
Celanese’s Second Amended Complaint asserts the following pertinent claims against OneBeacon: breach of the 1998 agreement and the 2001 agreement (Counts I and III), declaratory judgment as to each agreement (Counts II and IV), and breach of the policies as to duty to defend (Count V). Celanese moves for partial summary judgment essentially as to Count V, asking for a declaration that “OneBeacon is obligated to provide a full and complete defense to Celan-ese of any Liability Suit. ..” Motion, at 11. OneBeacon moves for partial summary judgment in its favor as to the same Count V.
OneBeacon argues that, under the terms of the agreements, it and Celanese “released Celanese’s claims for defense costs under the [underlying] OneB-eacon policies,” and that Celanese is therefore precluded from seeking recovery of defense costs under those policies. OneBeacon’s Memorandum in support of its motion, at 1. Celanese argues that OneBeacon has failed to provide “full and unlimited defense to Celanese” for the claims covered by the agreements, and instead “argues that intervening agreements . . . somehow relieve OneBeacon of its full defense obligations to Celanese.” OneBeacon’s position, argues Celanese, “cannot be reconciled with the plain language of these agreements, the insurance policies, the conduct of the parties, or the law.” Celanese’s Opposition to OneBeacon’s motion (Celanese’s Opposition), at 1-2.
The Court must therefore interpret the agreements in light of Celanese’s argument that its execution of the agreements did not cause it to lose rights to payment of full defense costs by OneBeacon under the policies, and OneBeacon’s argument that, by signing the agreements, Celanese agreed to forfeit any rights under the policies to costs of defending claims specified in the agreements.
The agreements both recite that they are to be construed in accordance with Delaware law. In The Council, Dorset Condo. Apt v. Gordon, 801 A.2d 1, 7 *295 (Del. 2002), the Delaware Supreme Court stated that “[a] court must interpret contractual provisions in a way that gives effect to eveiy term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole.” In Rhone-Poulenc v. American Motorists Ins., 616 A.2d 1192, 1195-96 (Del. 1992) (where the contract at issue was an insurance policy), the court set out the following additional general principles of construction:
A contract is not rendered ambiguous simply because the parties do not agree upon its proper construction. Rather, a contract is ambiguous only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings . . . Ambiguity does not exist where the court can determine the meaning of a contract “without any other guide than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.” .. . The true test is not what the parties to the contract intended it to mean, butwhat a reasonable person in position of the parties would have thought it meant.
(Citations omitted.)
Guided by the above principles, the Court analyzes the agreements as follows.
A. 1998 Agreement
The preliminary “whereas” clauses in the agreement signal the parties’ intent as to what the agreement was, and was not, to accomplish:
Whereas, a dispute currently exists between Commercial Union and HCC [i.e., Celanese] (hereinafter “the Parties”) as to their respective rights and obligations under the Alleged Insurance Policies concerning the defense and indemnification of HCC in connection with the Asbestos Bodily Injury Claims and the Chemical Exposure/Product Bodily Injury Claims; and
Whereas, this Agreement is intended to resolve only those issues relating to the defense of those Asbestos Bodily Injury Claims and Chemical Exposure/Product Bodily Injury Claims which are still pending [i.e., not settled]; and
Whereas, Commercial Union does not admit to the existence of all Alleged Insurance Policies or their applicability to the Asbestos Bodily Injury Claims and Chemical Exposure/Product Bodily Injury Claims;
Whereas, nothing in this Agreement is intended to alter, delete, change or modify any term, condition, obligation or policy exclusion of any policy issued by Commercial Union to HCC; and
Whereas, this Agreement is negotiated and freely entered into by the Parties to establish an orderly, non-litigated format for Commercial Union’s participation in and/or reimbursement of HCC’s defense with respect to claims and lawsuits arising from the Asbestos Bodily Injury Claims and Chemical Exposure/Product Bodily Injury Claims; and
Whereas, by subscribing to this Agreement, neither party relinquishes, waives, or admits the existence of coverage under any of the Alleged Insurance Policies.
1998 agreement, at 2-3.
The agreement next provides that the claims to be covered are listed in Exhibit B attached thereto, as well as “new” claims which “may become subject to this Agreement by Addendum which will become Exhibit ‘C.’ Upon mutual consent of the Parties, additional claims may be added to Exhibit ‘C’ by having the Parties countersign the bottom of Exhibit ‘C’ each time a new claim is agreed to be governed by the terms of this Agreement.” 1998 agreement at 2-3. Thus, the only new claims whose defense costs are governed by the 1998 agreement are those claims which both sides agree may be added to Exhibit C.
The agreement provides at paragraph 4: “This Agreement contemplates that in the event a disagreement arises with respect to the defense of any particular claim, the filing of a suit will only nullify this Agreement with respect to that particular claim, and the Agreement will remain intact as to all remaining claims.”
The agreement provides at paragraph 9:
9. This Agreement is without prejudice or value as precedent, and shall not be used in any proceeding or hearing to create, prove, or interpret the obligations under, or terms and conditions of, any other agreement, the Alleged Insurance Policies,- or any other insurance policy. It is understood and agreed that nothing herein shall be construed as a waiver, estoppel or invalidation of any position that the Parties have taken or may take in the future with respect to any coverage claims or defenses. Commercial Union denies that it has an obligation at this time to indemnify HCC for any settlement by or judgment against HCC arising from any of the claims subject hereto. This Agreement is a compromise with respect to HCC’s defense costs for claims identified on Exhibits “B” and “C,” and has no effect on indemnify. This Agreement nullifies any claims of bad faith, breach of contract, breach of duty, sanctions, violation, exemplary or extra contractual damages arising from, or in connection with, any purported defense obligation by Commercial Union for claims listed on Exhibits “B” and “C.” Commercial Union expressly reserves its rights under the Alleged Insurance Policies, and may assert any coverage defenses with respect to both defense and indemnity for any past, present and future claim tendered by HCC to Commercial Union.
And at paragraph 15:
*296 15. This Agreement is an integrated agreement and constitutes the entire understanding between the Parties, and replaces, cancels and supersedes any and all letters, communications, prior agreements, understandings or undertakings of the Parties, including any prior position the Parties may have asserted with respect to a particular claim.
It is plain from the quoted language that the parties intended to make a binding contract which would establish a format under which they would, by agreement (“non-litigated”), fund defense of the claims covered by the 1998 Agreement. The Court concludes, from the language of the agreement itself, including the statements of mutual understanding and intention in the preliminary “whereas” clauses, that the 1998 agreement was intended to provide the sole contractual mechanism by which Celanese was to pay defense costs for the specific claims listed in Exhibit B, or added, by agreement of both sides, to Exhibit C. As to those claims, and for the purpose of expediting their defense, the 1998 agreement expressly “resolves! 1” (second “whereas” clause quoted above) the parties’ “dispute” (first-quoted “whereas” clause) regarding defense costs payable under the policies; again, in paragraph 9, the parties agree that the 1998 agreement “is a compromise with respect to HCC’s defense costs for claims identified on Exhibits ‘B’ and ‘C’. . .” All rights and obligations of both parties, both as to indemnification of any claim, and as to defense costs for any claim not listed in Exhibits B or C, are preserved, and are to be resolved under the policies.
Celanese argues that several provisions in the 1998 agreement (discussed below) negate the Court’s interpretation, and require a ruling that the agreement was “interim in nature” and that, “[i]n the absence of the ‘novation’ of the insurance policy language through the cost sharing agreements, the OneBeacon Policies control OneBeacon’s duty to defend Celanese.” Celanese’s Opposition, at 2.
As noted above, the Court is required to interpret the provisions upon which Celanese relies, and the other provisions of the agreement, “in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole ...” The Council, Dorset Condo. Apt. v. Gordon, supra, 801 A.2d at 7. In addition, the Court must determine whether the agreement is ambiguous under the standard of Rhone-Poulenc v. American Motorists Ins., supra, 616 A.2d at 1195-96. The Court concludes that the provisions cited by Celanese may be reconciled with the other provisions of the 1998 agreement, read as a whole; do not render the agreement ambiguous because they are not, in context, “reasonably or fairly susceptible of different interpretations,” id.; and so do not support Celanese’s interpretation.
For example, Celanese points to paragraph 4, which provides that, “in the event a disagreement arises with respect to the defense of any particular claim, the filing of a suit will only nullify this Agreement with respect to that particular claim, and the Agreement will remain intact as to all remaining claims.” Celanese argues that its complaint in this action, “seeking a full defense of all the Liability Suits pursuant to OneBeacon’s duty to defend under the OneBeacon policies [and, under paragraph 4 and its counterpart in the 2001 agreement,] effectively nullified both agreements in their entirety.” Celanese’s Opposition, at 6. As Celanese reads paragraph 4, the dispute which both parties agreed to “resolve” and “compromise” in the 1998 agreement could be revived merely by filing a lawsuit as to any or all claims otherwise resolved.
Paragraph 4 may, however, be read in an alternative manner that is consistent with the agreement as a whole. The key language in paragraph 4 is this: “in the event a disagreement arises with respect to the defense of any particular claim . . .” (emphasis added). The parties’ use of “the defense,” rather than “the cost of defense,” or “non-payment of defense costs under this agreement,” is significant: “the defense,” in light of the overall purpose of the agreement to resolve and compromise disputes over defense costs, may reasonably be read to refer to the manner in which a claim listed on Exhibit B or C was being defended, rather than the cost of defense, or non-payment thereof. Neither party has argued that the manner of defense is in issue.
So read, paragraph 4 provides that, where there is a disagreement as to how a particular case is being defended, and one party files suit on that point, that claim ceases to be a claim governed by the defense cost-sharing arrangement of the 1998 agreement. Moreover, paragraphs 11 and 12, which provide a procedure for addressing disputed charges, strongly suggest that the parties intended to resolve such disputes within, rather than outside of, the terms of the 1998 agreement. Thus, any unresolved dispute regarding charges could be resolved by filing of a suit to enforce the 1998 agreement as to those charges — as Celanese has done in this case.
Celanese also relies on general provisions stating, in various ways, that each parties’ rights under the policies are preserved — e.g., “nothing in this Agreement is intended to alter, delete, change or modify any term, condition, obligation or policy exclusion of any policy . . .” (1998 agreement, at 2); “[i]t is understood and agreed that nothing herein shall be construed as a waiver, estoppel or invalidation of any position that the Parties have taken or may take in the future with respect to any coverage claims of defenses . . .” Id., para. 9.
Those general statements of reservation of rights and positions must be read in the context of specific provisions dealing with the parties’ rights as to the *297 disputed defense costs which the agreement “resolves” and “compromises”:
This Agreement nullifies any claims of bad faith, breach of contract, breach of duty, sanctions, violation, exemplary or extra contractual damages arising from, or in connection with, any purported defense obligation by Commercial Union for claims listed on Exhibits “B” and “C.”
1998 agreement, paragraph 9 (emphasis added); and:
This Agreement is an integrated agreement and constitutes the entire understanding between the Parties, and replaces, cancels and supersedes any and all letters, communications, prior agreements, understandings or undertakings of the Parties, including any prior position the Parties may have asserted with respect to a particular claim.
Id., para. 15 (emphasis added). Indeed, paragraph 15 cannot, in the context of the rest of the agreement, be read literally: to do so would mean that the 1998 agreement replaced and canceled every other prior agreement between the parties, including the policies. Instead, and to make sense of the whole agreement, paragraph 15 must be read as an agreement to replace only those portions of prior agreements which pertain to coverage for the defense of listed claims — just as the equally broad language which Celanese argues preserves eveiy previous agreement between the parties must be read to except so much of those other agreements — including the policies — which otherwise would apply to the cost of defending claims listed in Exhibits B and C.
Celanese’s own argument belies its position that the general reservation of rights clauses are absolute:
. . . the defense agreements only were a “final and binding settlement” of the claims for payment which Celanese submitted, and OneBeacon timely paid while the agreements were in effect. Both their language and purpose preclude OneBeacon’s mischaracterization that the agreements constituted a final and binding settlement of OneBeacon’s overall duty to defend. Indeed, neither party could compel the other to perform under the agreements. Their participation was voluntary and terminable at will. Once terminated, all unpaid defense costs became due and payable under the OneBeacon Policies.
Celanese’s Opposition, at 9. That argument proves both too much and too little: by admitting that the defense agreements were a “final and binding settlement” as to something, Celanese concedes both that the general reservations of rights provisions do not apply to matters resolved under the agreements, and that the agreements are enforceable contracts, not “voluntary,” as to listed claims. At the same time, Celanese’s understatement of the scope of the “binding settlement” — the agreement expressly “resolved” not just defense costs which OneBeacon “timely” paid, but OneBeacon’s obligation to pay defense costs of all listed claims — does not change the conclusion that the parties agreed to resolve disputes over defense charges under the 1998 agreement, not outside of it.
Celanese also argues that the 1998 agreement expired by its own terms in 2001, or at the latest in 2004. Paragraph 7 of the agreement does not, as Celanese argues, set a definite three-year term; rather, it provides that “[t]he initial term of this Agreement shall be for a period of three years . . .” The use of “initial” connotes subsequent terms (or at least that the agreement would survive beyond three years), an interpretation bolstered by the last sentence of paragraph 7: “This agreement may be . . . nullified only by a writing signed by or on behalf of’ a party.
In any event, whether the 1998 agreement has expired, and if so when, is a question of fact to be determined, inter alia, from evidence of the parties’ conduct. As a consequence, what claims are covered by that agreement — i.e., were added to Exhibit C by agreement of the parties under paragraph 3 — is also a question of fact. OneBeacon’s obligations as to defense costs for those claims which the jury concludes were added to Exhibit C, or otherwise were agreed to be governed by the 1998 agreement, will be governed by that agreement; those which were not will be governed by the policies.
B. 2001 Agreement
Much of the above discussion applies to the 2001 (“Photo Resist”) agreement, and will not be repeated here. Unlike the 1998 agreement, the 2001 agreement includes as signatories other insurers of Celanese. Nevertheless, the provisions of the 2001 agreement parallel, or restate verbatim, pertinent language from the 1998 Agreement.[2] Accordingly, the Court’s ruling as to the 2001 agreement will be the same as for the 1998 agreement with regard to duty to defend.
II. Choice of Law and c. 93A
OneBeacon moves for a determination that the law of New York, not Massachusetts, applies to the policies and that the law of Delaware applies to the agreements.[3]
With regard to the policies, which contain no applicable law provisions, the Court agrees with Celanese that a choice of law analysis is unnecessary because there is no meaningful disparity between the law of Massachusetts and New York regarding an insurer’s duty to defend.
Both jurisdictions follow the “four comers” rule as the standard for determining when the duty to defend is triggered. In New York, the duty to defend is triggered “when the ‘four corners of the complaint’ ” filed against the insured “suggest the reasonable possibility of coverage.” Fitzpatrick v. American Honda Motor Co., 78 N.Y.2d 61, 66 (1991) (noting that New York courts “have refused to permit insurers to look beyond the complaint’s allegations to avoid their obligation to *298 defend and have held that the duty to defend exists ‘[i]f the complaint contains any facts or allegations which bring the claim even potentially within the protection purchased.’ ” Id.). See also Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 648 (1993); Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co., 91 N.Y.2d 169, 175 (1997).
In Massachusetts, an insurer has a duty to defend if allegations contained in a complaint filed by a third party against the insured “are ‘reasonably susceptible’ of an interpretation that they state or adumbrate a claim covered by the policy terms ...” Doe v. Liberty Mut Ins. Co., 423 Mass. 366, 368-69 (1996); see also HDH Corp. v. Atlantic Charter Ins. Co., 425 Mass. 433, 436 (1997); The Liquor Liab. Joint Underwriting Ass’n of Mass. v. Hermitage Ins. Co., 419 Mass. 316, 319-20 (1995); Town of Ayer v. Imperial Cas. & Indem. Co., 418 Mass. 71, 73 (1994).
In Doe, the Court also noted that in Massachusetts it is well-settled law “that a liability insurer owes a broad duly to defend its insured against any claims that create a potential for indemnity. The duty to defend is broader than the duty to indemnify as an insurer may owe a duty to defend its insured in an action in which no damages ultimately are awarded.” 423 Mass. at 368-69 (internal citations omitted); see also Fitzpatrick, 78 N.Y.2d at 65 (stating that “an insurer may be contractually bound to defend even though it may not ultimately be bound to pay”). The Doe court looked only to the third-party complaint and the insurance policy to decide whether the insurer had a duty to defend. Doe, at 423 Mass. at 369. In addition, the insurer’s obligation to defend the insured cannot be escaped where the third party’s complaint is deficient but nonetheless there are “facts that are known or readily knowable by the insurer” which would give rise to its duty to defend. Derosiers v. Royal Ins. Co. of Am., 393 Mass. 37, 40 (1984).
Moreover, both jurisdictions recognize circumstances in which the duty to defend may not arise even where the four comers of a third party’s complaint against the insured implicate a duty to defend. See Town of Ayer, 418 Mass. at 73 (no duty to defend where third party’s complaint alleged injury from a motor vehicle, falling squarely within the automobile exclusion provision of a law enforcement professional liability insurance policy); Frontier Insulation, 91 N.Y.2d at 175 (an insurer can establish it lacks a duty to defend claims because they fall within a policy exclusion if the insurer can demonstrate that “the allegations of the complaint cast the pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable interpretation, and that there is no possible factual or legal basis upon which the insurer may eventually be held obligated to indemnify the insured under any policy provision”); Continental Cas. Co., 80 N.Y.2d at 650 (where insurer could not show the insured’s actions were intentional, the insurer “failed to ‘establish as a matter of law that there [was] no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision’ ”). Compare W.R. Grace & Co. v. Maryland Cas. Co., 33 Mass.App.Ct. 358, 364 (1992) (holding that under New York law, for an insurer to have no duty to defend, the court must “find as [a] matter of law that, based on the pleadings, there was no possible factual or legal basis on which [the insurer] might eventually be held obligated to indemnify” the insured).[4]
OneBeacon also argues that Massachusetts and New York treat allocation of defense costs among multiple insurers differently. Specifically, OneBeacon argues that under New York law each insurer is responsible only for its pro rata share of the cost of defending the insured, whereas in Massachusetts the liability is joint and several.[5]
The cases do not support OneBeacon’s position. In Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640 (1993), the plaintiff insurer (CNA) sought a declaration of its rights and the rights of the insured under certain insurance policies. The insured moved for summary judgment on the insurer’s duty to defend, while CNA cross moved, arguing that it had no duly to defend, but that if it did, another insurer, National Union Fire Insurance Company of Pittsburgh (which CNA had also joined as a defendant), should be required to contribute to defense costs on a pro rata basis. CNA also argued that the insured should be responsible for contribution to defense costs for alleged periods of self-insurance. 80 N.Y.2d at 647.
The New York Court of Appeals held:
We agree . . . that the question whether CNA had a claim for contribution against National is premature. National may eventually have to contribute both to defense costs and to indemnification . . . However, the duty to defend is broader that the duty to pay, requiring each insurer to defend if there is an asserted occurrence covered by its policy . . . , and the insured should not be denied initial recourse to a carrier merely because another carrier may also be responsible . . . That is the “litigation insurance” the insured has purchased . . . When more than one policy is triggered by a claim, pro rata sharing of defense costs may be ordered, but we perceive no error or unfairness in declining to order such sharing, with the understanding that the insurer may later obtain contribution from the other applicable policies.
Id. at 655-56 (citations omitted).
Massachusetts law is to similar effect. In Rubenstein v. Royal Ins. Co., supra, 44 Mass.App.Ct. 842, the insured sued five insurers, seeking a declaration that they had a duty to defend and indemnify the insured in an environmental cleanup case. The court agreed with the trial judge that the insured was “entitled to a full and complete defense from every insurer having a *299 duty to defend.” Id. at 849. With regard to allocation (both as to defense costs and indemnity), the court stated:
Royal’s appeal raises the question whether the [insured’s] damages should be apportioned among all of the insurers who provided insurance to the [insured] during the relevant time period, an issue which no Massachusetts appellate court has decided. Royal’s policy contains standard language providing that the insurer will pay on behalf of the insured “ail sums [emphasis in original] which the insured shall become legally obligated to pay as damages . . .” Courts in other jurisdictions have interpreted this same language to mean that, when multiple policies are triggered to cover the same loss, each policy provides indemnity for the insured’s entire liability, and each insurer is jointly and severally liable for the entire claim ... Of course, there is no bar against an insurer obtaining a share of indemnification or costs [emphasis added] from other insurers under the doctrine of equitable contribution.
Id. at 852. See also Chicago Bridge & Iron Co. v. Certain Underwriters at Lloyd’s, London, supra, 59 Mass.App.Ct. at 653-55. Thus, while New York and Massachusetts may treat allocation of indemnity obligations differently, see discussion above, they are in accord as to allocation of defense costs.
OneBeacon relies heavily on NL Industries, Inc. v. Commercial Union Ins. Co., 926 F.Sup. 446 (D.N.J. 1996). In that case, Commercial Union sought contribution for defense costs by adding, as third-party defendants, other insurers whose policies similarly were triggered by complaints filed against the insured, NL Industries. Id. at 451. The Court allowed the apportionment of defense costs against the other insurers as to those complaints filed against the insured which the Court could determine had triggered the insurers’ policies. Id. at 463-65.
OneBeacon cites NL Industries for the proposition that, under New York law, “one among multiple insurers with a duly to defend is not liable for all of an insured’s defense costs. Rather, it is liable only for its pro rata share of such costs and the insured is responsible for the share attributable to time periods during which it has no available insurance.” OneBeacon’s argument is both an inaccurate reflection of New York law, as the above discussion of Continental Casualty shows, and a misstatement of NL Industries (which held only that “sharing of defense costs may be ordered,” in the court’s discretion, “each insurer [to] contribute equally, or on a pro rata basis.” 926 F.Sup. at 462, citing Continental Cas. Co., 80 N.Y.2d at 655-56 (internal citations omitted). Furthermore, as noted above NL Industries is distinguishable from this case, in which OneBeacon is the only insurer of Celan-ese before the Court.
With regard to the 1998 and 2001 agreements, as noted above they are by their respective terms to be construed in accordance with the law of Delaware.
OneBeacon also moves for summary judgment at to Count X, charging violation of G.L.c. 93A and c. 176D. After reviewing the parties’ submissions, the Court concludes that genuine issues of material fact remain, including whether Celanese’s claim under Count X is tort-based as well as contract-based, and whether the alleged actions and transactions of the three defendants named in Count X occurred “primarily and substantially within the commonwealth.” G.L.c. 93A, §11.
III. OneBeacon’s Affirmative Defenses
Celanese moves, in two separate motions, for summary judgment with regard to certain of OneBeacon’s affirmative defenses. In its Motion for Summary Judgment Regarding Estoppel of OneBeacon’s Policy Defenses, Celanese moves for summary judgment as to the first, eighth, and ninth affirmative defenses “to the extent that OneBeacon may rely on Celanese’s compliance with policy conditions, provisions or requirement as a defense to Celanese’s causes of action and claims for relief’). Motion, at 1. In its Motion for Summary Judgment on OneBeacon’s Fifth and Eighth Affirmative Defenses," Celanese moves for summary judgment “to the extent these defenses are premised on Celanese’s purported noncompliance with defense guidelines.” Motion, at 1.
Both motions rely in part on Celanese’s argument that OneBeacon’s duty to defend the subject claims is found only in the policies, not the 1998 agreement. Because the Court has rejected that argument in the above discussion of OneBeacon’s duty to defend, and because both motions raise genuine issues of material fact, the motions will be denied.
ORDER
For the reasons stated above, the Court rules as follows on the parties’ motions for summary judgment.
I. Celanese’s and OneBeacon’s respective motions for partial summary judgment regarding duty to defend.
As to those bodily injury claims against Celanese which the jury determines to be claims listed in, or added by agreement to, respectively, the 1998 “Defense Cost Sharing Agreement Between Commercial Union and Hoechst Celanese Corporation," or the 2001 “Defense Agreement Between Celanese and Celanese Insurers Regarding Photo Resist Claims,” OneBeacon’s duty to defend, and the parties’ rights and obligations pertaining thereto, shall be governed by whichever of the foregoing agreements applies. As to all other bodily injury claims as to which Celanese seeks defense costs in its Second Amended Complaint, OneBeacon’s duly to defend, and the parties’ rights and obligations pertaining thereto, shall be governed *300 by any insurance policy alleged in the complaint which the juiy determines is applicable to such claims.
II. OneBeacon’s motion regarding choice of law and applicability of G.L.c. 93A.
The motion is DENIED. The policies shall be construed according to Massachusetts law; the 1998 and 2001 agreements shall be construed according to Delaware law.
III. Celanese’s motions regarding OneBeacon’s affirmative defenses.
The motions are DENIED.

The 2001 agreement is “intended to resolve” issues relating to defense of the subject lawsuits (p. 1); it is a “compromise and accord” (id.); the agreement “supercedes all other representations and agreements made between Celanese and the Celanese Insurers with respect to the Photo Resist Lawsuits which are subject to this Agreement” (p. 2); the agreement “contemplates that in the event a disagreement arises with respect to the defense of any particular claim or Lawsuit, the filing of a suit will only nullify this agreement with respect to that particular claim or Lawsuit. . .” (p. 4); “nothing herein shall be construed as a waiver, estoppel or invalidation of any position that the Parties have taken or may take in the future with respect to any coverage claims or defenses. This Agreement further nullifies any claims of bad faith, breach of contract, breach of duty, sanctions, violation, exemplary or extra contractual damages arising from . . . claims or Lawsuits for which a defense is being provided by Celanese Insurers . . .” (pp. 7-8).

The parties have presented and argued the motion in the context of OneBeacon’s duly to defend under the policies and the 1998 and 2001 agreements. See OneBeacon’s Memorandum in Support of Motion for Partial Summary Judgment: Choice of Law and Chapter 93A, at 5-7 (noting that “(t]he first step in a choice of law analysis is to determine whether an actual conflict exists between the substantive law of the interested jurisdictions ...” (emphasis in original), and identifying the “clear differences . .. between the substantive law of New York and Massachusetts,” which make a choice of law analysis necessary, as those relating to duty to defend). See also OneBeacon’s Reply Memorandum, at 6-7 (the “clear differences . .. are further described in OneBeacon’s opposition to Celanese’s motion for partial summary judgment with respect to the duty to defend”). Celanese defended the motion on the same basis. See Celanese’s Opposition, at 3 (“. . . OneBeacon now asks the Court to engage in an unnecessary and indeed improper choice of law analysis based on the fabricated differences between the laws of Massachusetts and New York regarding the duty to defend . . .”) (emphasis in original). Accordingly, the Court’s ruling on OneBeacon’s motion addresses the applicable law regarding duty to defend. While the Court concludes, below, that there is no meaningful distinction between the law of Massachusetts and New York regarding insurers’ obligations to pay defense costs, there may well be a distinction between the two jurisdictions regarding the allocation of liability among multiple insurers to indemnify claims against the insured. Compare A. W. Chesterton Co. v. Massachusetts Insurers Insolvency Fund, 445 Mass. 502 (2005), at 506 n.3 (“The proper allocation [of liability for] so-called Tong tail’ claims has twice been addressed by the Appeals Court and twice resolved in favor of the ‘all sums’ method. See Chicago Bridge & Iron Co. v. Certain Underwriters at Lloyd’s, London, 59 Mass.App.Ct. 646, 653-55, (2003); Rubenstein v. Royal Ins. Co., 44 Mass.App.Ct. 842 (1998), S.C., 429 Mass. 355 (1999). We have not had occasion to address the merits of an ‘all sums’ versus a ‘pro rata’ method of allocation. Because neither party argues the latter, analysis of the issue should wait for another day.”), and Consolidated Edison Company of New York, Inc. v. Allstate Insurance Company, 98 N.Y.2d 208, 224 (2002) (“(j]oint and several allocation in the present factual setting is inconsistent with the unambiguous language of the policies before us . . . [where those policies provide] indemnification for ‘all sums’ of liability that resulted from an accident or occurrence ‘during the policy period . . . Pro rata allocation under these facts, while not explicitly mandated by the policies, is consistent with the language of the policies” (emphasis in original)). Both jurisdictions emphasize the importance of “particular construction of the sometimes subtle, but nonetheless pivotal, differences in” policies to the type of allocation appropriate in a particular case. Chicago Bridge & Iron Co. v. Certain Underwriters at Lloyd’s, London, 59 Mass.App.Ct. 646, 657 (2003); see Consolidated Edison, at 221-22. Here, OneBeacon has drawn to the Court’s attention no such policy language regarding indemnification, nor any differences in the manner in which New York and Massachusetts would address such language in the circumstances of this case.

OneBeacon argues that the four corners rule is not followed in asbestos and chemical personal injury cases in New York, and that insurers are instead “permitted to go beyond the four corners of a complaint to determine whether or not a claimant was exposed to asbestos or the chemical at issue during the insurer’s policy period.” OneBeacon’s Mem., at 5-6, citing Burt-Rigid Box v. Travelers Prop. Cos. Corp., 302 F.3d 83 (2d Cir. 2002). While the court in that case stated that the District Court did not commit error in holding that undisputed, extrinsic evidence had “established that there was no set of facts under which” the underlying “claims would or could be covered” by the insurer, the court did not hold that the four comers mle was inapplicable to asbestos and chemical personal injury claims. Burt-Rigid, 302 F.3d at 96-97. Instead, the court acknowledged the use of the four comers rule in New York in determining an insurer’s duty to defend, and said that “New York courts have, in appropriate cases, considered extrinsic evidence where that evidence may conclusively establish that an insurer faces no possible liability.” (Emphasis added.) Even if the Second Circuit Court of Appeals correctly stated New York law (but see W.R. Grace & Co., supra 33 Mass.App.Ct. at 364), OneBeacon has not directed the Court to any evidence in support of its motion for summary judgment establishing, “as a matter of law, that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision.” Burt-Rigid, 302 F.3d at 97 (citation omitted). OneBeacon also cites Olin Corp. v. Insurance Co. of North Amer., 603 F.Sup. 445 (S.D.N.Y. 1985), arguing that the duty to defend “in large scale toxic tort cases requires proof of the extent to which injury actually occurred during” the policy period. OneBeacon’s Memorandum, at 6. However, Olin contradicts subsequent New York case law, which requires the court to look to the four comers of the complaint filed against the insured. See Continental Cas. Co. v. Rapid-American Corp., 80 N.Y.2d 640, 648 (1993); Fitzpatrick v. American Honda Motor Co., 78 N.Y.2d 61, 66 (1991). Furthermore, as Celanese points out, the Olin decision has been criticized as inconsistent with the law of New York. See Abex Corp. v. Maryland Cas. Co., 790 F.2d 119, 129 n.44 (D.C. Cir. 1986).

The Court notes, as a preliminary matter, that the present case is unlike the cases upon which OneBeacon relies because here the only insurer which is a party is OneBeacon, whereas in those cases multiple insurers were before the court. While the issue may thus be, at best, premature in the posture of this case, the Court will consider it.