# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| GERALD N. SMERNOFF, TRUSTEE UNDER THE GERALD N. SMERNOFF REVOCABLE TRUST DATED MAY 24, 2000 and MYRNA M. SMERNOFF, TRUSTEE UNDER THE MYRNA M. SMERNOFF REVOCABLE TRUST DATED MAY 24, 2000, | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2020-0798-BWD |
| THE KING'S GRANT CONDOMINIUM ASSOCIATION, INC. and COUNCIL OF KING'S GRANT CONDOMINIUM, | ) ) ) ) ) | |
| Defendants. | ) | |

## POST-TRIAL FINAL REPORT

Final Report:  July 12, 2024
Date Submitted:  June 17, 2024

John A. Sergovic, Jr., SERGOVIC CARMEAN WEIDMAN MCCARTNEY & OWENS, P.A., Georgetown, Delaware; *Attorney for Plaintiffs*.

Mary R. Schrider-Fox, STEEN, WAEHLER & SCHRIDER-FOX, LLC, Ocean View, Delaware; *Attorney for Defendants*.

**DAVID, M.**

Owners of a condominium unit in Fenwick Island have sued their condominium association and council, seeking specific performance of the condominium's governing documents. According to the unit owners, exterior walls, windows, and doors are common elements that the council must maintain, repair, and replace; they seek an order requiring the association to repair damaged exterior windows and doors protecting their unit. The association and council disagree, asserting that the governing documents make unit owners responsible for maintaining, repairing, and replacing the exterior windows and doors attached to their respective units. For the reasons below, this post-trial final report adopts the unit owners' interpretation of the governing documents and recommends judgment in their favor.

## I.    BACKGROUND

The following facts are drawn from the Stipulation of Facts for Legal Determination by the Court in Lieu of Trial, exhibits attached thereto, and argument presented at a one-day trial on a paper record held on June 17, 2024.[1]

### A.    The Parties

Gerald N. Smernoff, trustee under the Gerald N. Smernoff Revocable Trust dated May 24, 2000, and Myrna M. Smernoff, trustee under the Myrna M. Smernoff

---

[1] Stip. Of Facts For Legal Determination By The Ct. In Lieu Of Trial [hereinafter, "Stip. R."], Dkt. 66.

Revocable Trust dated May 24, 2000 (together, "Plaintiffs"), own Unit 15 of Building C ("Unit 15") of the King's Grant Condominium (the "Condominium"), located at 15 King's Grant in Fenwick Island, Delaware.[2]

King's Grant Condominium Association, Inc. (the "Association"), a Delaware corporation, acts as the Condominium's unit owners association.[3] The Council of King's Grant Condominium (the "Council," and together with the Association, "Defendants") is the body tasked with managing the business operations and affairs of the Condominium on behalf of the unit owners.[4]

## B. The UPA And The Governing Documents

On April 15, 1985, non-party declarant Beach Development Corporation established the Condominium under the Delaware Unit Properties Act ("UPA").[5] The Condominium is governed by a Code of Regulations for King's Grant Condominium Documents (the "COR")[6] and a Declaration of Condominium Submitting Real Property to Provisions of Unit Property Act, 25 *Del. C.* Section

---

[2] *Id.* ¶ 1.

[3] *Id.* ¶ 2.

[4] *Id.* ¶ 3; Verified Compl. For Specific Performance Of The Condominium Docs. Of The King's Grant Condominium And/Or In The Alternative Decl. J. To Determine The Common Elements Under The Condominium Docs. Of The King's Grant Condominium [hereinafter, "Compl."], Ex. 3 §§ 2.1(p), 3.2, Dkt. 1.

[5] Compl., Ex. 1 [hereinafter, "Decl."] § 1.01.

[6] Compl., Ex. 3 [hereinafter, "COR"].

2201, *Et Seq*. King's Grant Condominium (the "Declaration"),[7] which incorporates a Declaration Plan for King's Grant Condominium (the "Declaration Plan," and together with the COR and the Declaration, the "Governing Documents").[8]

In this action, the parties dispute responsibility for maintaining, repairing, and replacing the north-facing entry windows and door (sometimes referred to as a "glass wall" or "window wall") of Unit 15.[9] Together, the UPA, the COR, and the Declaration (which the COR incorporates by reference) allocate responsibility for maintenance, repair, and replacement between the unit owners and the Council, depending on whether a "Unit" or a "Common Element" is at issue.[10]

### 1. Units

The UPA defines a "Unit" as "a part of the property designed or intended for any type of independent use . . . ." 25 *Del. C.* § 2202(19). The Declaration specifies the boundaries of a Unit within the Condominium as follows:

---

[7] *See* Decl. at 1.

[8] *See id*. at 2, § 3.01(B); COR §§ 1.1, 2.2(f).

[9] Stip. R. ¶ 19; *see also* Compl. at 15.

[10] COR § 1.1. The parties agree that the COR incorporates by reference the Declaration, such that both documents form the operative contract governing the analysis. Defs.' Ans. Trial Br. On The Stip. R. [hereinafter, "AB"] at 7, Dkt. 76; *see also Star States Dev. Co. v. CLK, Inc.*, 1994 WL 233954, at *4 (Del. Super. May 10, 1994) ("Where a written contract refers to another instrument and makes the terms and conditions of such other instrument a part of it, the two will be construed together as the agreement of the parties . . . ." (quoting 17A Am. Jur. 2d Contracts § 400 (1991) (ellipses in original))).

The vertical boundaries of each unit are that the lowermost elevation is the top surface of the lowermost subfloor and the uppermost elevation is the interior side of the roof ridge at the highest point of the roof. The highest point of the unit is the lower surface of the highest roof rafters or trusses. The horizontal boundaries of each unit as to depth and width are the space between the interior face of the wall studs.[11]

Section 6.8(a) of the COR requires that "[e]very Unit Owner must perform promptly all maintenance and repair work within his own Unit . . . ."[12] Similarly, Section 9.02 of the Declaration states that:

Each unit owner shall, at unit owner's expense, keep the interior of its unit in good order and repair and in a clean and sanitary condition and shall do all redecorating, painting and varnishing that may, at any time, be necessary to maintain the good appearance and condition of the Unit. In addition, each unit owner shall maintain, repair or replace any plumbing, fixtures, heating, ventilating, and air conditioning or air compression equipment, lighting fixtures, refrigerators, dishwashers, disposals, ranges, clothes washers and dryers and carpeting located within the unit . . . .[13]

In addition, Section 11.03(e) of the Declaration provides that unit owners are responsible for maintaining, repairing, and replacing "all non-load bearing walls, floors and partitions and windows and door in such unit."[14]

---

[11] Decl. § 3.01(O).

[12] COR § 6.8(a).

[13] Decl. § 9.02.

[14] *Id*. § 11.03(e).

4

### 2. Common Elements

The UPA defines "Common Elements" to include "portions of the building which are not included in a unit," "[t]he foundations, structural parts, supports, main walls, roofs, basements, halls, corridors, lobbies, stairways and entrances and exits of the building," and "[s]uch facilities as are designated in the declaration as common elements." 25 *Del. C.* § 2202(3)(a)-(b), (h).

Section 2.1(d) of the COR states that "'Common Elements' are as defined in the [UPA] and are more fully described in Section 4.05 of the Declaration."[15] Section 4.05 of the Declaration, in turn, defines Common Elements to include "all portions of the building which are not included in a unit," "[a]ll supports and other foundation elements of the building not included in the unit," and "[t]he roof, the exterior walls, excluding the chimney flue, the fire party walls between the units, and such component parts of walls, floors, ceilings and other structures and installation as are outside the unit boundaries . . . ."[16]

The UPA provides that "[t]he maintenance and repair of the common elements . . . shall be carried out only as provided in the code of regulations[,]"[17] and that "the common expenses shall be charged to the unit owners according to the percentage

---

[15] COR § 2.1(d).

[16] Decl. § 4.05(A), (C), (I).

[17] 25 *Del. C.* § 2205.

of the undivided interest of each in the common elements, as set forth in the declaration . . . ."[18]  Both the COR and the Declaration allocate responsibility for maintaining, repairing, and replacing Common Elements to the Council.  The COR states that "the Council shall be vested with the . . . power and dut[y] . . . [to] maint[ain], repair, replace[], and landscap[e] . . . the Common Elements"[19] and that "[a]ll maintenance, repairs and replacements to the Common Elements . . . shall be made by the Council and be charged to all of the Unit Owners as Common Expenses."[20]  The Declaration provides:

> The maintenance, repair, replacement, management, operation and use of the common elements shall be the responsibility of the Council . . . . The expenses which have been incurred or shall be incurred for the maintenance, repair, replacement, management, operation and use of the common elements shall be collected from the unit owners and assessed as common expenses by the Council.[21]

---

[18] 25 *Del. C.* § 2216.  The UPA defines "Common expenses" to include:

> a. Expenses of administration, maintenance, repair and replacement of the common elements;
>
> b. Expenses agreed upon as common by all the unit owners; and
>
> c. Expenses declared common by provisions of this chapter or by the declaration or the code of regulations.

25 *Del. C.* § 2202(4).

[19] COR § 3.2(a).

[20] *Id*. § 6.8(d).

[21] Decl. § 10.01.

## C.    The 1997 Chancery Action And The Arbitration

Plaintiffs purchased Unit 15 in June 1994.[22]   At some point thereafter, Plaintiffs complained that structural problems with the second and third-floor decks above Unit 15 had caused water damage to the "structural system" for Unit 15.[23]

A 1996 engineering report concluded that "the structural system underlying Unit 15 had rot caused by the laminated veneer lumber used for girders and floor beams, which were not made of pressure treated lumber as is necessary when wood materials are exposed to the elements[,]" and that "the northeast corner of Unit 15 had inadequate structural support, leading to window/door problems, water infiltration and rot."[24]   In March 1997, Benjamin Smith Builders, Inc. prepared a document recommending repairs (the "Repair Plan"), which included "removing and replacing the rear decks, jacking up the corner of the building, removing and replacing all rotten structural components, and replacing or removing and resetting, as applicable, windows, doors, siding, drywall and other building components damaged as a result of the structural problems that existed in 1997."[25]

---

[22] Dkt. 16, Ex. A ¶ 1.

[23] Pls.' Preview Letter To The Ct. [hereinafter, "Pls.' Letter"], Ex. 1 ¶ 21, Dkt. 59.

[24] Stip. R. ¶ 7.

[25] *Id*. ¶ 8.

On May 7, 1997, Plaintiffs filed a lawsuit in this Court, captioned *Smernoff v. The King's Grant Condominium Association, Inc.*, C.A. No. 18785-S (the "1997 Chancery Action").[26]    In the 1997 Chancery Action, Plaintiffs "sought a determination of which party bore the responsibility to make the repairs" outlined in the Repair Plan.[27]  Ultimately, the Association "accepted responsibility for [making] the repairs described in the [R]epair [P]lan,"[28] and those repairs were completed throughout 1997 and 1998.[29]  With Plaintiffs' request for equitable relief resolved, the 1997 Chancery Action was dismissed and Plaintiffs' remaining claim for damages was transferred to the Superior Court.[30]

The Superior Court ordered the parties to submit Plaintiffs' damages claim to non-binding arbitration.  On November 8, 1999, the parties participated in non-binding arbitration before Mark F. Dunkle, Esquire (the "Arbitration").[31]  The next day, Mr. Dunkle issued an order (the "Arbitration Order") "find[ing] for the Plaintiffs . . . and against Defendants in the amount of $20,000.00 for 1997 lost

---

[26] *Id.* ¶ 4; *see also* Pls.' Letter, Ex. 1.

[27] Stip. R. ¶ 5 (citing Pls.' Letter, Ex. 1 ¶ 21).

[28] *Id.* ¶ 9.

[29] *Id.* ¶ 10 (citing Stip. R., Ex. B).

[30] *Id.* ¶ 11; *see also* Resp. To Pls.' Preview Letter From Mary R. Schrider-Fox, Att'y For Defs., Ex. C at 1, Dkt. 62.

[31] Stip. R. ¶ 12; *see also* Pls.' Letter, Ex. 2 at 1.

rentals and $6,592.00 for out of pocket repair costs, together with costs . . . ."[32]

Enclosed with the Arbitration Order, Mr. Dunkle sent the parties a letter describing his reasoning, which stated: "[a]lthough the building may appear as comprised of individual structures, the entire building (except windows and other minor portions) is a common element and the responsibility of the Condominium Association."[33]

On January 27, 2000, the Arbitration Order became an order of the Superior Court.[34]

### D. The Council Disclaims Responsibility For Repairing The Exterior Walls, Windows, And Doors Of Unit 15.

In 2014—fifteen years after the Arbitration—Plaintiffs complained that "exterior water penetration under and around the exterior-facing windows, exterior doors and exterior walls" on the north-facing side of Unit 15 had "again" caused damage to their unit.[35]

In November 2014, George, Miles & Buhr, LLC inspected the north-facing side of Unit 15 and produced a report (the "GMB Report") concluding that:

> There d[id] not appear to be a sill pan beneath the bottom of the window. Without a sill pan, the only means to prevent water infiltration between the joints of the glass and the wood stop is the sealant. Where

---

[32] Pls.' Letter, Ex. 2 at 1.

[33] Pls.' Letter, Ex. 3 at 1. The letter "was not filed with Superior Court and did not become a part of any order of the Superior Court." Stip. R. ¶ 13.

[34] Stip. R. ¶ 14.

[35] Pls.' Op. Br. On The Stip. R. [hereinafter, "OB"] at 11, Dkt. 71; *see also* Compl. ¶ 14.

leakage was present, the water was getting behind the sealant, leaking under the interior wood stop and into the interior. This construction is common, and water infiltration can be kept to a minimum if the sealant is replaced when deteriorated. A longer lasting solution would be to install sill pans beneath the base of each window, however that would involve the removal and reinstallation of each window.[36]

The GMB Report recommended "replacing the sealant around the perimeter of each window with a quality silicone sealant by Dow, GE or an approved equivalent" and proposed "[a]n alternative to bonding to wood could be to clad the wood stops with aluminum cladding prior to installing the sealant."[37]

In the summer of 2018, Plaintiffs asked the Council to make the repairs recommended in the GMB Report.[38] The Council took the position that "the[] windows[,] like all other windows in Kings Grant[,] are the responsibility of the unit owner[,]" and "recommend[ed] [Plaintiffs] replace the[] windows."[39]

### E. Procedural History

On September 18, 2020, Plaintiffs initiated this action through the filing of a Verified Complaint ("Complaint").[40] Count I of the Complaint requests:

specific performance of the Defendants' obligations and duties under the Declaration, Declaration Plan and Code of Regulations of the King's Grant Condominium to repair and/or replace the damaged

---

[36] Stip. R. ¶ 24; *see also* Compl., Ex. 4.

[37] *Id.*

[38] Compl., Ex. 5 at 38-39.

[39] *Id.* at 40.

[40] Dkt. 1.

10

common elements and nonfunctioning exterior windows, doors and walls protecting Unit 15 from the elements and the water intrusion damage to Unit 15 caused by the damaged nonfunctioning exterior common element windows, doors and walls.[41]

Count II seeks a declaration, purportedly on behalf of all unit owners, "that all exterior windows, doors and walls protecting Unit 15 and all like situated units in King's Grant Condominium, are common elements under the Declaration, Declaration Plan and Code of Regulations of the King's Grant Condominium."[42]

In April and May 2021, the parties cross-moved for summary judgment.[43] On June 15, 2022, Magistrate Griffin, to whom this action was assigned, issued a final report denying the cross-motions for summary judgment.[44] Vice Chancellor Glasscock overruled exceptions to that final report on October 10, 2022.[45]

On August 16, 2023, the parties filed a Stipulation of Facts for Legal Determination by the Court in Lieu of Trial.[46] On March 6, 2024, Plaintiffs filed an Opening Trial Brief on the Stipulated Record.[47] On April 2, 2024, Defendants filed

---

[41] Compl. ¶¶ 7, 31-39.

[42] *Id.* ¶¶ 8, 40-47.

[43] Dkts. 14, 16.

[44] Dkt. 33 at 17.

[45] Dkt. 48 at 2 (first citing Decl. §§ 4.05, 11.03(e), and then citing COR § 6.8(d)).

[46] Dkt. 66.

[47] Dkt. 71.

an Answering Trial Brief on the Stipulated Record.[48]  On May 3, 2024, Plaintiffs

filed a Reply Trial Brief on the Stipulated Record.[49]  The Court held a one-day trial

on a paper record on June 17, 2024.[50]

## II.    ANALYSIS

The parties' trial briefs tee up three issues for resolution.[51]  First, Plaintiffs

assert that the doctrine of collateral estoppel should preclude Defendants from

disputing their responsibility for making the repairs recommended in the GMB

---

[48] Dkt. 76.

[49] Pls.' Reply Tr. Br. On The Stip. R. [hereinafter, "RB"], Dkt. 82.

[50] Dkt. 85.

[51] In briefing, Plaintiffs purport to:

> incorporate and adopt the arguments as set forth in their Motion for Summary Judgment, Reply to Defendants' Answer to Plaintiffs' Motion for Summary Judgment, Opening Brief in Support of Exceptions to Magistrate's Draft Report, Answering Brief to Defendants' Exceptions to the Magistrate's Draft Report, Opening Brief in Support of Exceptions to the Magistrate's Final Report, Answering Brief to Defendants' Exceptions to the Magistrate's Final Report, Reply Brief in Support of Exceptions to the Magistrate's Final Report, and Stipulation of Facts for Legal Determination in Lieu of Trial.

OB at 8 (footnotes omitted).  Notwithstanding Plaintiffs' blanket reference to all prior arguments ever raised in the more than seventy docket entries preceding their pre-trial opening brief, this report addresses only the arguments that are fairly presented in the trial briefs.  *See Riker v. Teucrium Trading, LLC*, 2020 WL 2393340, at *10 n.96 (Del. Ch. May 12, 2020) (rejecting an argument that the plaintiff presented "before trial in opposing a motion *in limine*" because "th[at] statement [wa]s not part of the trial record"); *cf. Oxbow Carbon & Minerals Hldgs., Inc. v. Crestview-Oxbow Acq., LLC*, 202 A.3d 482, 502 n.77 (Del. 2019) ("The practice in the Court of Chancery is to find that an issue not raised in post-trial briefing has been waived, even if it was properly raised pre-trial." (citations omitted)).

Report. Second, the parties ask the Court to interpret the UPA and the Governing Documents to determine who—unit owners or the Council—is responsible for maintaining, repairing, and replacing exterior walls, windows, and doors within the Condominium. And third, each side seeks to shift attorneys' fees incurred in this action onto the other.

**A.    Defendants Are Not Precluded From Disputing Responsibility For Repairing Exterior Windows And Doors.**

As a threshold matter, Plaintiffs argue that the doctrine of collateral estoppel should preclude Defendants from contesting their responsibility for making the repairs recommended in the GMB Report because Defendants were previously required under the Arbitration Order to pay damages caused by their delay in making the repairs at issue in the 1997 Chancery Action.

The doctrine of collateral estoppel "precludes a party to a second suit involving a different claim or cause of action from the first from relitigating an issue necessarily decided in a first action involving a party to the first case." *One Va. Ave. Condo. Ass'n of Owners v. Reed*, 2005 WL 1924195, at *10 (Del. Ch. Aug. 8,

2005).[52]  To determine whether collateral estoppel bars consideration of an issue, the

Court considers whether:

> (1) The issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

*Betts v. Townsends, Inc.*, 765 A.2d 531, 535 (Del. 2000) (quoting *State v. Machin*, 642 A.2d 1235, 1239 (Del. 1993)).

The parties dispute only the first element of the collateral estoppel analysis—whether the Arbitration Order decided the same issue presented in this action.[53] Plaintiffs contend that the 1997 Chancery Action and this action "both concern responsibility for repair of . . . exterior common elements."[54]  But, as Plaintiffs

---

[52] The parties have not briefed whether collateral estoppel applies to contract interpretation, but "[u]nder Delaware law, the collateral estoppel doctrine applies broadly to a court's determinations of 'rights, questions, or facts.'" *PVP Aston, LLC v. Fin. Structures Ltd.*, 2023 WL 2728775, at *7 (Del. Super. Mar. 31, 2023) (quoting *Hercules Inc. v. AIU Ins. Co.*, 783 A.2d 1275, 1278 (Del. 2000)).  "The Delaware rule also extends to legal rulings." *Id.*; *see also BuzzFeed Media Enters., Inc. v. Anderson*, 2024 WL 2187054, at *15 (Del. Ch. May 15, 2024*)* ("[The] doctrine of collateral estoppel 'bars successive litigation of "an issue of fact or law" that is "actually litigated and determined by a valid and final judgment, and . . . is essential to the judgment."'" (alteration in original) (citation omitted)); *cf.* Restatement (Second) of Judgments § 27 (Am. L. Inst. 1982) ("[T]he phrase 'issue of fact or law' has been substituted for 'question of fact' so that the Section is now applicable to questions of law and law application as well as questions of fact.").

[53] OB at 8.

[54] *See id*. at 18; RB at 18.

effectively concede, the issue presented in the 1997 Chancery Action is *not* identical to the central issue here.[55] In the 1997 Chancery Action, Plaintiffs sought to hold the Council responsible for repairing water damage to "structural systems underlying Unit 15" caused by "inadequate structural support . . . ."[56] Notably, the Arbitration Order awarded damages caused by the Association's delay in making repairs based on Mr. Dunkle's reasoning that "the entire building (*except windows* and other minor portions) is a common element and the responsibility of [Defendants]."[57] But here, the primary issue is whether unit owners or the Council are responsible for maintaining, repairing, and replacing exterior windows and doors. The parties did not litigate, and the Arbitration Order did not decide, that issue. As a result, Defendants are not precluded from contesting the Council's responsibility to maintain, repair, and replace exterior windows and doors.[58]

---

[55] *See* OB at 18 ("While *in the 1997 action windows and doors specifically may not have been addressed*, as they are common elements and Defendants are responsible for maintaining, repairing, and replacing all common elements, the end result is that the two issues are identical." (emphasis added)).

[56] Stip. R. ¶ 7.

[57] Pls.' Letter, Ex. 3 at 1 (emphasis added).

[58] The parties' briefing focuses on whether Defendants are collaterally estopped from relitigating responsibility for repairing and replacing exterior windows and doors. I therefore do not address any effect that the doctrine of collateral estoppel might have on arguments concerning other structural components.

**B.** **The Governing Documents Allocate Responsibility For Maintaining, Repairing, And Replacing Common Elements—Including Exterior Windows And Doors—To The Council.**

The primary dispute in this action is who bears responsibility for maintaining, repairing, and replacing exterior walls, windows, and doors within the Condominium. Plaintiffs assert it is the Council; Defendants contend it is the unit owners.

To resolve this issue, the Court must look to the UPA and the Governing Documents. "A condominium declaration and its accompanying code of regulations together form a contract between the unit owners under the statutory framework of the [UPA]." *Reed*, 2005 WL 1924195, at *6. "A court must interpret contractual provisions in a way that gives effect to every term of the instrument, and that, if possible, reconciles all of the provisions of the instrument when read as a whole." *Council of Dorset Condo. Apartments v. Gordon*, 801 A.2d 1, 7 (Del. 2002). "[A] court will prefer an interpretation that harmonizes the provisions in a contract as opposed to one that creates an inconsistency or surplusage." *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2012 WL 2356489, at *4 (Del. Ch. June 21, 2012). "Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one." *DCV Hldgs., Inc. v. ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005).

### 1. Exterior Walls, Windows, And Doors Are Common Elements.

To determine whether the unit owners or the Council are responsible for maintenance, replacement, and repairs, the Court first must decide whether the repairs at issue implicate a Unit or Common Elements.

In this case, both parties agree that exterior walls, windows, and doors are Common Elements as defined in the Governing Documents.[59] The Declaration defines Common Elements to include "such component parts of walls, floors, ceilings and other structures and installation as are outside the unit boundaries[,]" where "[t]he horizontal boundaries of each unit as to depth and width are the space between the interior face of the wall studs."[60] Because exterior walls, windows, and doors are not within the interior face of the wall studs—and are therefore outside the unit boundaries—they are Common Elements.

### 2. Section 11.03(e) Of The Declaration Does Not Carve Out Exterior Windows And Doors From The Council's Duty To Repair Common Elements.

Exterior walls, windows, and doors are Common Elements. As explained above, the UPA provides that "[t]he maintenance, repair and replacement of the common elements . . . shall be carried on only as provided in the code of

---

[59] OB at 13; AB at 16.

[60] Decl. §§ 3.01(O), 4.05 (I).

regulations[,]"[61] and both the COR and the Declaration allocate responsibility for maintaining, repairing, and replacing Common Elements to the Council.[62] According to Plaintiffs, the analysis ends here—the Council is responsible for maintaining, repairing, and replacing the exterior walls, windows, and doors of Unit 15 and throughout the Condominium.

Defendants, however, keep reading. They point to Section 11.03(e) of the Declaration, which states that unit owners are responsible for maintaining, repairing, and replacing "all non-load bearing walls, floors and partitions and *windows and door*[*s*] in such unit."[63] Defendants contend that when read together, "the Governing Documents charge the Defendants with the general responsibility of maintaining, repairing and replacing the Common Elements of the Condominium[,]" but "that general charge of responsibility is limited and qualified by Section 11.03(e) of the Declaration, which specifically confers responsibility for the maintenance, repair and replacement of windows and doors" on unit owners.[64]

Plaintiffs concede that under the UPA, the Governing Documents *could* have been drafted to shift liability from the Council to the unit owners for certain Common

_____

[61] 25 *Del. C.* § 2213.

[62] COR §§ 3.2(a), 6.8(d); Decl. § 10.01.

[63] Stip. R. ¶ 37 (citing Decl. § 11.03) (emphasis added).

[64] AB at 22.

Elements, including exterior windows and doors.[65] But they contend that here, the plain language of Section 11.03(e) does not apply to exterior windows and doors.[66] After careful review of the contract language, I agree with Plaintiffs' reading. Section 11.03(e) makes unit owners responsible for maintaining, repairing, and replacing "windows and door[s] *in such unit*."[67] Interior windows and doors may be "in such unit," but exterior windows and doors are Common Elements that, by definition, are "portions of the building . . . *not included in a unit*."[68] Any other reading would render the words "in a unit" superfluous. Section 11.03(e) therefore does not shift liability for exterior doors and windows from the Council to the unit owners.[69]

---

[65] *See Goss v. Coffee Run Condo. Council*, 2003 WL 21085388, at *8 (Del. Ch. Apr. 30, 2003) (describing the UPA as "generally an enabling statute, allowing the allocation of rights and obligations within the condominium community"). For example, Section 11.08 of the Declaration provides that Common Element porch screens exterior to the Unit are the obligation of unit owners: "In the event that any porches on the bayside are screened, such screening and its future maintenance shall be the obligation of the unit owners and shall not be a common expense." Decl. § 11.08.

[66] *See* AB at 15.

[67] Decl. § 11.03(e) (emphasis added).

[68] 25 *Del. C.* § 2202(3)(a); Decl. § 4.05(A).

[69] The parties agree that the Governing Documents are unambiguous and that the Court need not consider extrinsic evidence to interpret them. *See* OB at 16; AB at 14; RB at 16. I note, however, that even if the Court were to consider the extrinsic evidence Defendants submitted, the fact that other unit owners have not challenged the Association's interpretation of the Governing Documents would not persuade me that the Association's interpretation is correct. *See* Stip. R., Ex. F.

To support their alternative reading, Defendants rely on *Council of Dorset Condominium Apartments v. Gordon*, 801 A.2d 1 (Del. 2002), in which the Delaware Supreme Court interpreted language similar to Section 11.03(e) to "carve out . . . windows and sliding doors from the exterior items for which the Council bears responsibility." *Dorset*, 801 A.2d at 6. Importantly, however, the declaration in *Dorset* defined a "Unit" to include "'the patio and or balcony connected to a Unit (*including all doors* leading to such patio or balcony), [*and*] *all windows* of a Unit.'" *Id*. at 5 (emphasis added). That "specific language exclude[d] the [exterior] windows and doors from the common elements," such that exterior windows and doors were, by definition, "in such unit." *Id*. By contrast, here, the Declaration makes exterior windows and doors Common Elements, "which are not included in a unit." So, while the *Dorset* court found that language requiring the unit owners to maintain, repair, and replace "windows and doors *in such Unit*" included exterior windows and doors, the same is not true under the Declaration here.

To summarize, under the plain language of the Governing Documents, exterior walls, windows, and doors are Common Elements, and the Council is responsible for maintaining, repairing, and replacing them; Section 11.03(e) of the

Declaration does not carve out exterior windows and doors from the Common Elements for which the Council bears responsibility.[70]

### C. Attorneys' Fees

Each side seeks to shift attorneys' fees onto the other. Plaintiffs seek an award of attorneys' fees under Section 13.5 of the COR, which states:

> If any action is brought by one or more but less than all Unit Owners on behalf of all Unit Owners and recovery is had, the plaintiff's expense, including reasonable counsel fees, shall be a Common Expense, *provided that if* such action is brought against all other Unit Owners or against the Council, the officers, assistant officers, employees or agents thereof, in their capacities as such, with the result that *the ultimate liability asserted would, if proved, be borne by all the Unit Owners, the plaintiff's expenses, including counsel fees, shall not be charged to or borne by the other Unit Owners*, as a Common Expense or otherwise.[71]

The parties agree that Plaintiffs constitute "less than all Unit Owners" and purport to bring their declaratory judgment count "on behalf of all Unit Owners."[72] The result of Plaintiffs' recovery, however, is that the cost of maintenance, repairs, and replacement of exterior walls, windows, and doors will be "borne by the other Unit

---

[70] Alternatively, Plaintiffs contend that even if unit owners are responsible for repairing and replacing exterior windows, it is the structural elements, and not the windows themselves, in need of repair. In light of the reasoning above, the Court need not resolve that argument.

[71] COR § 13.5 (emphasis added).

[72] AB at 35.

Owners, as a Common Expense . . . ."[73]  Therefore, Plaintiffs are not entitled to fee shifting under Section 13.5.[74]

In addition, both parties seek attorneys' fees under Section 81-417(a) of the DUCIOA, which states:

> If a declarant or any other person subject to this chapter fails to comply with any of its provisions or any provision of the declaration or bylaws, any person or class of persons adversely affected by the failure to comply has a claim for appropriate relief. The court, in an appropriate case, may award court costs and reasonable attorneys' fees.

25 *Del. C.* § 81-417(a).  Although "Section 81-417 contemplates a lower standard for expense shifting than the bad-faith exception to the American Rule[,]" fee-shifting under Section 81-417(a) is permissive and the Court retains broad discretion to determine whether to shift fees.  *Bragdon v. Bayshore Prop. Owners Ass'n, Inc.*, 251 A.3d 661, 667 (Del. Ch. 2021).  A case may be appropriate for fee-shifting where a party has "acted unreasonably" or in an "arbitrary and capricious" manner or has "engaged in unreasonable litigation conduct."  *Id.* at 688.  That showing has not been made here, however.  Both requests are denied.

---

[73] COR § 13.5.

[74] To the extent Plaintiffs argue that Defendants should be collaterally estopped from opposing fees under Section 13.5, that argument is rejected.  The issue of legal fees was not fairly presented in the 1997 Chancery Action and the Arbitration Order did not interpret Section 13.5.

## III. CONCLUSION

As explained above, the Governing Documents require the Council to maintain, repair, and replace exterior walls, windows, and doors. This is a final report under Court of Chancery Rule 144. If issues remain for resolution, the parties should file a joint letter so informing the Court. Otherwise, the parties shall meet and confer on a proposed form of final order and judgment to implement this final report. Exceptions are stayed pending entry of a final order and judgment.